**In re ARTHUR TREACHER'S FRANCHISEE LITIGATION.**

**MDL No. 467.**

United States District Court, E. D. Pennsylvania.

Nov. 6, 1981.

John M. Elliott and Edward F. Mannino, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for Arthur Treacher's Fish & Chips, Inc. and Mrs. Paul's.

Franklin Poul, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for franchisees.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

### I. Preliminary Statement

This Memorandum will address several discovery related problems which have recently arisen in this litigation. Specifically, the following motions are pending:

(1) Motion Of Arthur Treacher's Fish & Chips, Inc. And Mrs. Paul's Kitchens To Compel Answers To Deposition Questions Objected To On Grounds Of Attorney-Client Privilege And For Reimbursement Of Reasonable Costs, Including Attorney's Fees, MDL Docket Entry No. 193.

(2) Motion Of Arthur Treacher's Fish & Chips, Inc. For Sanctions, MDL Docket Entry No. 203.

(3) Motion Of Defendant Kenneth L. Horstmyer, and his counsel, Frank H. Griffin, III, Esquire, For A Protective Order And For An Order Quashing A Subpoena, MDL Docket Entry No. 218.

(4) Motion Of Arthur Treacher's Fish & Chips, Inc. And Mrs. Paul's Kitchens For Sanctions To Compel Answers To Deposition Questions Objected To On Improper Grounds And To Compel Answers To Questions Counsel For Plaintiff Was Unable To Propound When The Deposition Was Improperly Terminated And For Reimbursement Of Reasonable Costs, Including

Attorney's Fees, MDL Docket Entry No. 210.

These motions were all filed between October 2, 1981 and October 19, 1981.

The Court attempted to shorten the discovery process by ordering that all discovery motions must be accompanied by a certification that the parties met and attempted to amicably resolve their dispute. *See* Pretrial Order No. 1, MDL Docket Entry No. 15 filed on June 22, 1981. Further steps designed to move this litigation along were recently taken when I ordered that reply briefs to answering briefs in discovery motions would not be permitted without leave of Court. *See* Transcript Of Second Pretrial Conference, October 20, 1981, MDL Docket Entry No. 229 at 8. Reply briefs to answering briefs in non-discovery motions are permitted provided they are filed within seven (7) days of service of the answer to the motion. *See* Interim Memorandum No. 2 at 6, MDL Docket Entry No. 220; Local Rule of Civil Procedure 20(c).

The primary role of a judge is to be an arbiter. This Court will make every effort to prevent that role from becoming subsumed within a secondary role which courts at times must assume during lengthy and complex litigations—that of refereeing the bitter in-fighting resulting from the uncooperative exchange of discovery. The first conflict which has culminated in a formal application under Fed.R.Civ.P. 37 arose at the depositions of franchisee defendants Michael Henehan, Leon Magnes, Richard Benefield, Kenneth Nadel and Theodore Tolles.[1]

### II. Motion of Arthur Treacher's Fish & Chips, Inc. And Mrs. Paul's Kitchens To Compel Answers To Deposition Questions Objected To On Grounds Of Attorney-Client Privilege And For Reimbursement Of Reasonable Costs, Including Attorney's Fees.

The problem which prompted this motion apparently first arose at Benefield's deposi-

---

1. For further background to this litigation *see generally Memorandum And Order*, October 15, 1981, MDL Docket Entry No. 212; *Findings Of Fact And Conclusions Of Law*, August 3, 1981,

MDL Docket Entry No. 101; *Interim Memoranda Nos. 1 & 2*, August 21, 1981 and October 20, 1981, MDL Docket Entry Nos. 135 & 220.

tion on August 13, 1981. We conducted an in-chambers conference on August 19, 1981 in an attempt to arrive at an amicable solution. However, the informal intervention on the Court's part proved to no avail and this formal application was filed on October 2, 1981.

Subsequent to Benefield's deposition, the depositions of Henehan (August 24, 1981), Tolles (September 2, 1981), Magnes (September 9, 1981), and Nadel (September 30, 1981) were taken. At each deposition, certain questions were objected to and the respective witnesses were instructed not to answer. The majority of the objections raised were based upon the attorney-client privilege. The work-product doctrine was also invoked and a number of questions were objected to on relevancy grounds.

At the direction of the Court, Arthur Treacher's has provided full copies of the transcripts of the pertinent depositions. Furthermore, a full list of the questions to which Arthur Treacher's Fish & Chips, Inc. seeks answers has also been submitted. *Reply Memorandum Of Law In Support Of Arthur Treacher's Fish & Chips, Inc.'s And Mrs. Paul's Kitchens, Inc.'s Motion To Compel Answers To Deposition Questions*, MDL Docket Entry No. 222, Appendix "A".[2] Those questions are the following:

1. Was the topic of Gulf City Fisheries being a supplier to the Arthur Treacher's franchisee association ever discussed at a meeting at which you were present? (Benefield deposition at p. 116)

2. And have you ever been present at a meeting at which the prospect of Gulf City Fisheries being a supplier to the franchisee association has been discussed? (Benefield deposition at p. 117)

3. Who was present at that meeting? (Benefield deposition at p. 120)

4. Were other members of the Arthur Treacher's franchisee association present? (Benefield deposition at p. 120)

5. What was the purpose of this meeting? (Benefield deposition at p. 121)

6. Was the purpose to seek legal advice from the attorneys at Weil, Gotshal? (Benefield deposition at p. 121)

7. How many people were present at this meeting? (Benefield deposition at p. 122)

8. How long did the meeting last? (Benefield deposition at p. 123)

9. On what date did the meeting occur? (Benefield deposition at p. 123)

10. Was the subject of setting up an alternative franchisee system discussed at this meeting? (Benefield deposition at p. 123)

11. Was the refusal of the franchisee association to pay royalties discussed at this meeting? (Benefield deposition at p. 123)

12. What members of Arthur Treacher's franchisee association board were present? (Benefield deposition at p. 124)

13. Were any persons present who were not members of the board of Arthur Treacher's franchisee association present? (Benefield deposition at p. 124)

14. What was the next most recent meeting at which you were present? ... At which you discussed Gulf City Fisheries, Inc. (Benefield deposition at p. 125)

15. Did you attend any meetings prior to March of 1980 for which attorneys from Weil, Gotshal were present? (Benefield deposition at p. 126)

**2.** This reply memorandum was filed just prior to the Court's direction that it would no longer permit reply briefs to discovery motions without specific leave of court first being obtained. *See* Transcript Of Second Pretrial Conference, *supra* at 8. Thus, this particular reply brief was properly considered and the specific listing of questions contained therein was helpful. The Court notes however, in the event it has to rule upon future motions to compel, that it would have been more appropriate to provide this list of questions in the first instance—in the moving brief.

16. Have you and Mr. Henahan ever had any discussions concerning the withholding of royalties? (Benefield deposition at p. 129)

17. How much have you contributed to the legal defense fund? (Benefield deposition at p. 147)

18. Has M.I.E. Hospitality made contributions to the franchisee association legal defense fund? (Benefield deposition at p. 151)

19. Have the funds that have been collected by Arthur Treacher's Franchisee Association, as part of the legal defense fund, been used to pay for the cost and attorneys' fees incurred by the franchisees such as A & B Management in their litigation against Arthur Treacher's? (Benefield deposition at p. 151)

20. Did you have any discussions with Mr. Tolles about Mr. Tolles's [sic] interest in acquiring Arthur Treacher's? (Benefield deposition at p. 161)

21. Who was at this meeting [most recent meeting of Arthur Treacher's Franchisee Association]? (Nadel deposition at p. 71)

22. What was the purpose of the meeting? (Nadel deposition at p. 72)

23. What subjects were discussed at the meeting? (Nadel deposition at p. 72)

24. Was the purpose of the meeting to seek legal advice? (Nadel deposition at p. 72)

25. Were any persons present who were not members of the Arthur Treacher's Franchisee Association board of directors? (Nadel deposition at p. 72)

26. Were any persons present who were not members of the Arthur Treacher's Franchisee Association at this meeting? (Nadel deposition at p. 72)

27. Were business strategies discussed at this meeting? (Nadel deposition at p. 72)

28. Were possible options concerning alternative franchisee systems discussed at this meeting? (Nadel deposition at p. 72–73)

29. Was the withholding of royalties by franchisees discussed at this meeting? (Nadel deposition p. 73)

30. Was the use of Golden Dip batter by certain franchisees discussed at this meeting? (Nadel deposition at p. 73)

31. Did you ever have any discussions with Mr. Tolles about the lawsuit? (Nadel deposition at p. 136)

32. What have you and Mr. Tolles discussed concerning the lawsuit? (Nadel deposition at p. 136)

33. Has a proposal been made that someone inquire of Orange Co. concerning that prospect [of Orange Co. purchasing Arthur Treacher's]? (Nadel deposition at p. 138)

34. Has Mr. Mallory ever discussed with you the possibility of Pillsbury acquiring Arthur Treacher's? (Nadel deposition at p. 140)

35. Did you ever have a discussion with several other Arthur Treacher franchisees about their taking their signs down? (Henahan deposition at p. 5, August 24, 1981 a. m. session)

36. Were you asking for an opinion as to whether or not the signs would have to go down? (Henahan deposition at p. 6, August 24, 1981 a. m. session)

37. About how many times were there meetings with the attorneys present where the questions of the signs came up? (Henahan deposition at p. 6, August 24, 1981 a. m. session)

38. What were those possible names [that Agostine Malerba may use for his stores]? (Henahan deposition at p. 21, August 24, 1981 a. m. session)

39. Now, at this meeting that Mrs. Cohn invoked the attorney-client privilege for, did other franchisees besides Mr. Malerba discuss the possibility of using different names for their stores? (Henahan deposition at p. 25, August 24, 1981 a. m. session)

40. Can you tell us the nature of those discussions [concerning the payment of royalties with other franchisees]?

(Henahan deposition at p. 26, August 24, 1981 p. m. session)

41. Did anyone say "I would like your legal opinion on such and such an issue"? (Henahan deposition at p. 152, August 25, 1981)

42. Did anyone say "I'm going to give you the following facts on which you can give me legal advice"? (Henahan deposition at p. 152, August 25, 1981)

43. Do you know how much is in the [Arthur Treacher's Franchisee Legal Defense] Fund today? (Tolles deposition at p. 122)

44. Is the Fund controlled by a particular committee of the Franchisee Association? (Tolles deposition at p. 122)

45. How many assessments have been made of the members of the Arthur Treacher's Franchisee Association relating to Legal Defense Fund? (Tolles deposition at p. 123)

46. Is there presently a two-percent assessment relating to gross sales which members are supposed to use to contribute to the Legal Defense Fund? (Tolles deposition at p. 123)

47. When was the last assessment of the Legal Defense Fund? (Tolles deposition at p. 123)

48. Was Mr. Malerba given any money personally from the Legal Defense Fund? (Tolles deposition at p. 123)

49. Did the Fund pay any amounts for legal expenses incurred during the Horstmyer litigation? (Tolles deposition at p. 124)

50. Has anyone contributed to the Fund who is not a member of the Franchisee Association? (Tolles deposition at p. 124)

51. Have you ever been involved in an effort to request members of the Franchisee Association or Arthur Treacher's franchisees to make payments into the Legal Defense Fund? (Tolles deposition at p. 128)

52. Have you ever contacted any Arthur Treacher's franchisees in an effort to have the franchisee contribute money to the Legal Defense Fund? (Tolles deposition at p. 128)

53. What topics were discussed at the [August 31, 1981 franchisee] meeting? (Magnes deposition at p. 130)

54. Did you agree to pay two percent of your gross sales [to the Legal Defense Fund] (Magnes deposition at p. 139)

55. Have there been any complaints by any franchisees regarding the amounts that have been assessed for the Legal Defense Fund? (Magnes deposition at p. 140)

An examination of the above questions reveals that most of them pertain to meetings of the franchisees which the deponents refused to answer invoking the attorney-client privilege and arguing the applicability of the work-product doctrine. (Questions No. 1–16; 20–42; 53). The remainder of the questions pertain to the franchisee association Legal Defense Fund (Questions No. 17–19; 43–52; 54–55). These were objected to on relevancy grounds. Having set forth the questions for which an order compelling answers is sought, the Court will turn its attention to a resolution of the motion.

The parties generally agree upon the standard applicable to the attorney-client privilege, classically enunciated in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950):

The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* at 358–359. Where the parties differ is on the application of the privilege and its parameters to the particular questions asked of the various witnesses.

■ Of those questions generally pertaining to the meetings held, some were apparently asked in an attempt to ascertain whether or not the privilege was being invoked properly. The Court is specifically referring to Questions No. 3–9, 12–13, 15, 21–22, 24–26, and 41–42, *supra.* These questions did not seek to elicit any confidential information but rather were aimed at establishing the applicability or lack thereof, of the privilege. Hence, the Court considers objections to these questions to be premature and the questions will be answered.

■ The remainder of the questions revolving around the meetings seek to elicit information concerning topics of discussion at the meetings, or the subject matter of the purportedly privileged communications. On the assumption that, following the answering of the preliminary questions going to the valid existence of the privilege, the franchisees establish the presence of the criteria set forth in *United Shoe, supra,*[3] the question becomes whether the plaintiff can inquire about the *subject matters* discussed at the meetings, notwithstanding the proper existence of the privilege. *See* Questions No. 1–2, 10–11, 14, 16, 20, 23, 27–40, 53. On this score, plaintiff relies upon *J. P. Foley & Co., Inc. v. Vanderbilt,* 65 F.R.D. 523 (S.D. N.Y.1974). To the extent that the *Foley* opinion stands for the proposition that the privilege would never operate to preclude inquiry into the subject matter of privileged communications, this Court disagrees and declines to follow that precedent. *See Foley, supra* at 526. The better view of the parameters of the privilege was expressed in *Lee National Corp. v. Deramus,* 313 F.Supp. 224 (D.Del.1970). The *Deramus* court felt that even the subject matter of confidential communications falls within the ambit of the attorney-client privilege, absent a waiver. The rationale offered for this conclusion is persuasive, and, in this Court's opinion, particularly pertinent to this litigation:

[F]irst, an affirmative response to such a question could be taken, by implication, to suggest that a client considered his position, with respect to the issues discussed, as either suspect or vulnerable. Second, such a rule would erode the basic public policy underlying the attorney-client privilege. It would be a simple matter to sharpen the questions to require greater and greater specificity regarding the matter discussed so as to avoid altogether the effectiveness of the privilege. Third, if the responses were merely limited to the most general terms of the subject discussed, it would be of little benefit or enlightenment to an opponent or to the Court, for certainly the privilege would prevent further questions going to the content of the discussions.

*Deramus, supra* at 227. Thus, agreeing with and adopting the rationale set forth in *Deramus,* the deponents need not answer questions concerning the subject matter of the *confidential communications* exchanged at these meetings. The defendants must remember, however, that they have the burden of establishing the existence of the privilege both with regard to the substance and the subject matter of the communications. Questions concerning the interchanging of views among the franchisees, for example, are not privileged if not made in the presence of their attorneys and for the purpose of seeking legal advice, etc. *See, e.g.,* Questions No. 16, 20, 31–32, 34–35, 38 and 40, *supra.* Similarly, discussions of a purely financial or business nature are not privileged, again assuming these discussions were not entered into for the purpose of eliciting the attorney's advice as to the legal overtones of the various business strate-

---

**3.** Plaintiff would have the Court rule at this point that the privilege is inapplicable because the communications at issue relate to facts of which the attorneys were informed for the purpose of committing a tort, *i.e.* an alleged conspiracy to destroy Arthur Treacher's. *See* Plaintiff's Reply Memorandum at 6. The Court is presently unpersuaded by this argument. *See* Memorandum In Opposition To [Plaintiff's Motion], Docket Entry No. 207 at 24–26.

gies possibly discussed. *See, e.g.*, Questions No. 1–2, 10, 27–28, 33–34, *supra.* The Court hopes that the guidance contained herein is sufficient and that the intelligence and integrity of the counsel involved will prevail and will prevent further application to the Court. Thus, for the reasons stated, the Court presently will not compel answers to Questions No. 1–2, 10–11, 14, 16, 20, 23, 27–40 and 53, listed *supra.*

Finally, there are a group of questions concerning the operation of the franchisee Legal Defense Fund. *See* Questions No. 17–19, 43–52, 54–55, *supra.* These questions will be answered subject to any objections which the defendants may raise and which may be renewed at time of trial. *See Lloyd v. Cessna Aircraft Co.*, 74 F.R.D. 518 (E.D.Tenn.1977); Fed.R.Civ.P. 30(c).

Each side will bear its own costs and expenses relating to this motion.

### III. Motion Of Arthur Treacher's Fish & Chips, Inc. For Sanctions

This motion pertains to franchisee-defendants Arthur Treacher's Fish & Chips of Central New Jersey, Inc., Arthur Treacher's of Mercer County, Inc., Arthur Treacher's of Camden County, Inc., and John W. Perkins, all of whom, for the sake of clarity, will be referred to as the "first group." Also named in the motion for sanctions are Arthur Treacher's Fish & Chips of Staten Island, Inc., Arthur Treacher's Fish & Chips of Washington County, Inc., Midwest Fish & Chips, Inc., Jerry Olson, Robert Charles, Arthur Treacher's Fish & Chips of Monmouth, Inc., Arthur Treacher's Fish & Chips of Ocean, Inc., Arthur Treacher's Fish & Chips of Burlington County, Inc., and Richard Vonella. These will be referred to as the "second group" of franchisees involved in this motion.

Interrogatories were served on all of the above defendants on July 22, 1981 and Requests For Production Of Documents were served on August 3, 1981. No response of any kind was filed by the franchisees and Arthur Treacher's filed the instant motion on October 7, 1981. The first group of defendants, *supra,* answered Arthur

Treacher's motion on October 20, 1981. Subsequent to filing this answer to the motion, counsel for the first group of defendants and counsel for Arthur Treacher's were able to reach an agreement and they have filed a Stipulation which for the time being obviates a ruling on this motion as it pertains to them. *See* MDL Docket Entry No. 240.

The second group of defendants, however, have not answered the interrogatories or produced the documents requested. The record further discloses that no answer to the present motion has been filed by this second group of defendants. The Court is unable to fathom this total lack of response on the part of these defendants. Not only have the discovery requests been ignored but the Motion For Sanctions filed on October 7, 1981 remains unanswered. The relief or sanctions sought by Arthur Treacher's is a default judgment against these defendants. Rule 37(d) of the Federal Rules of Civil Procedure authorizes the use of a default judgment as a sanction for failure to abide by the discovery rules. *See* Fed.R. Civ.P. 37(b)(2)(C). In this case there has been total noncompliance with the discovery rules and also with the local rules of this Court governing motion practice. *See* Local Rule of Civil Procedure 20(c). The Court cannot but conclude that this total lack of response was either willful or the result of gross negligence. In any event, under the circumstances presented herein, it is clearly within my discretion to impose the severe sanction of a default judgment. *Al Barnett & Son, Inc. v. Outbound Marine Corp.*, 611 F.2d 32, 35–36 (3d Cir. 1979); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 959 (S.D.N.Y.1980). In the Court's view, this sanction is warranted against the second group of defendants listed *supra.* Flagrant ignorance of the discovery rules and the local rules of this Court, as occurred here, obviously will not be condoned. Furthermore, the sanction imposed herein will presumably deter future noncompliance and perhaps will spur more amicable exchanges of discovery than have occurred heretofore.

An order will be entered granting in part Arthur Treacher's motion as to defendants Arthur Treacher's Fish & Chips of Staten Island, Inc., Arthur Treacher's Fish & Chips of Washington County, Inc., Midwest Fish & Chips, Inc., Jerry Olson, Robert Charles, Arthur Treacher's Fish & Chips of Monmouth, Inc., Arthur Treacher's Fish & Chips of Ocean, Inc., Arthur Treacher's Fish & Chips of Burlington County, Inc., and Richard Vonella. A default will be entered against these defendants with a judgment by default to follow appropriate hearings or trial on the issue of damages. Unless the parties can agree upon the expenses incurred by Arthur Treacher's in filing this motion, evidence will also be heard on that issue, if necessary. In the event the Court has overlooked something, or there is some viable explanation for this apparent utter disregard of the rules of discovery and of this Court, the attention of counsel for these defendants is directed to Local Rule of Civil Procedure 20(g) which provides for the filing of Motions For Reconsideration within ten (10) days.

### IV. Motion for A Protective Order And For An Order Quashing A Subpoena

On October 14, 1981, Arthur Treacher's filed a Notice of deposition of Frank H. Griffin, III, Esquire. See MDL Docket Entry No. 209. Mr. Griffin is counsel to Kenneth L. Horstmyer, a defendant in this litigation. Mr. Griffin's deposition was noticed for October 22, 1981 at 10:00 A.M. On October 19, 1981, defendant Horstmyer and his counsel, Mr. Griffin, filed a Motion For A Protective Order directing that the deposition not be taken. The motion also seeks an order quashing the subpoena served on Mr. Griffin. MDL Docket Entry No. 218.

On October 20, 1981, this Court directed Arthur Treacher's to answer the present motion by October 23, 1981 and, furthermore, the Court ordered the Griffin deposition stayed. See Transcript of October 20th Conference, supra at 8. In addition, the Court suggested as a practical compromise that perhaps Arthur Treacher's could file Interrogatories for Mr. Griffin to answer.

See id. at 21. Apparently the parties have been unable to compromise or amicably resolve this matter and I will therefore address the motion. For sake of brevity, the motion filed on behalf of Horstmyer and his counsel will simply be referred to as "defendant's motion."

Defendant makes two arguments in support of the motion. First, that the notice of attorney Griffin's deposition is an attempt by Arthur Treacher's to intrude upon the attorney-client and work-product privileges. The second argument is that the motivation underlying the attempt to depose Griffin is harassment since "[t]hey have already deposed and questioned Mr. Horstmyer at tremendous length." Memorandum In Support Of [Defendant's Motion] at 3.

Neither of these arguments persuade the Court that the protective order, as sought, should be entered. Rule 30(a) of the Federal Rules of Civil Procedure provides in part that "any party may take the testimony of any person, including a party, by deposition upon oral examination." (emphasis added). This language includes an attorney for a party to the action. See 8 Wright & Miller, Federal Practice And Procedure: Civil § 2102 at 369–370 (West 1970). As the Court stated in Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979): "It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." 593 F.2d at 651. The Court is not satisfied that "extraordinary circumstances" are present here which would warrant an order preventing "altogether" the taking of the deposition. The fact that the proposed deponent is an attorney for one of the parties in the case is clearly not enough, by itself, to justify granting in full the motion for a protective order. See Wright & Miller, supra; Daniels v. Hadley Memorial Hospital, 68 F.R.D. 583, 588–589 (D.D.C.1975). If the questions to be asked of Mr. Griffin delve into privileged areas then his recourse will be to object and refuse to answer. Such an objection and refusal to answer should of course be predicated upon a sufficient dem-

onstration that the matter inquired into is privileged. *See generally* Part II *supra.* In any event, the Court cannot rule in a vacuum, prior to the deposition, that every question to be asked will seek to elicit privileged information. Arthur Treacher's contends that Mr. Griffin possesses relevant, non-privileged information. *See* Arthur Treacher's Fish & Chips And Mrs. Paul's Kitchens, Inc.'s Memorandum In Opposition To [Defendant's Motion], MDL Docket Entry No. 226 at 3. If this is indeed the case, it would be premature for this Court to render a "before-the-fact" decision on the propriety of the questions to be asked of Mr. Griffin.

Defendant, in its moving brief, cites two cases in support of its motion. In *Walker v. United Parcel Services*, 87 F.R.D. 360 (E.D. Pa.1980), my colleague, the Honorable Norma L. Shapiro, denied the plaintiff's request for leave to depose defendant's attorney. Judge Shapiro relied upon the district court's power to restrict discovery under Fed.R.Civ.P. 26(c) and she felt that "deposing the attorney would be largely duplicative, lead to unnecessary further delay, and be oppressive to the party and to the person whose deposition is sought." 87 F.R.D. at 361. Defendant, in his brief, quotes the following language from the *Walker* opinion:

> The Court would ordinarily require attorney-client and work product exception questions to be resolved at a deposition rather than in the abstract in advance. *However, the proposed intrusion on defendant's right to counsel is too invasive to permit. Plaintiffs would depose counsel not only on the very subject matter of the court hearing, but on the manner of counsel's preparation for it. Short of prohibiting the deposition, it is hard to imagine how to protect UPS [the defendant] from revelation of its attorney's mental impressions, opinion, legal theories, or litigation strategy.* Such revelations should not be permitted absent a strong showing of necessity or prejudice or hardship in preparation of Plaintiffs case. *Id.* at 362.

*Memorandum In Support Of [Defendant's Motion]* at 2–3 (citations omitted and emphasis by the defendant). While this Court agrees with the reasoning utilized and the result reached in *Walker, supra,* I am not at all persuaded that the "proposed intrusion" at issue here is "too invasive to permit" and thus the factual setting of the *Walker* decision is distinguishable.

The other case relied upon by defendant, *Draney v. Wilson, Morton, Assaf & McElligott,* 30 F.R.Serv.2d 960. (D.Ariz. 1980), was cited for the proposition that "[t]he deposition of an attorney of record should be permitted sparingly and only upon a strong showing of good cause." *Id.* at 961. While the deposing of an attorney of record is certainly not a common practice, this Court knows of nothing in the rules, and the *Draney* court offered nothing, to support the proposition that it must be predicated upon a "strong showing of good cause." If an attorney of record possesses relevant, non-privileged information, that information ought to be discoverable just as it would be if possessed by a party or a non-party to the litigation. Plaintiff contends in its opposition to the protective order motion that the subject matter of the deposition will relate to relevant, non-privileged information. If this is the case, it clearly would be error to deny plaintiff the opportunity to discover that information.

On the other hand, there are factors which weigh in defendant's favor and deserve attention. First, the discovery sought appears to be somewhat duplicative in that it will focus primarily upon an October 21, 1980 meeting attended by attorney Griffin, his client, and three other defendants. Certainly the circumstances surrounding that meeting, and events prior and subsequent to it, are discoverable from the four defendants who were present thus rendering Mr. Griffin's testimony arguably cumulative. Second, defendant's claim that the motivation underlying the notice of deposition is harrassment is not entirely without merit as evidenced by the overbreadth of the subpoena which, "in effect, calls for the production of counsel's entire file in these matters ...." *Defendant's Motion* at 2. The

list of documents which the subpoena commands Griffin to bring to the deposition is attached as Exhibit "A" to the subpoena. The list is indeed broad. For example, paragraph four orders Griffin to bring to the deposition any documents "which refer or relate to Kenneth L. Horstmyer ...." Obviously, as counsel to Horstmyer, Mr. Griffin will hardly have any document in his possession pertaining to this litigation which does not "refer or relate" to Horstmyer. Griffin also represented Horstmyer in a separate action against Arthur Treacher's which was not a part of this Multidistrict Litigation—Civil Action No. 80–3443. Thus, most, if not all, of Griffin's file in that action also falls within the language of Exhibit "A" to the subpoena. Defendant's argument is thus persuasive that the subpoena requiring the production listed in Exhibit "A" is unduly broad. The Court will therefore grant that part of defendant's motion which seeks an order quashing the subpoena.

The third factor which weighs in defendant's favor is simply the fact that it is his attorney whose deposition is sought. While I have already noted that this fact alone does not grant Griffin any special immunity, there nevertheless are practical consequences to consider in resolving this unusual situation. For example, will Griffin's testimony in this matter ultimately require him to remove himself as counsel to Horstmyer and will this, in turn, unduly prejudice defendant Horstmyer's case? *See* Code Of Professional Responsibility, DR 5–102 (West Pamph. 1981); *see also* American Bar Association Commission on Evaluation of Professional Standards: Final Draft of the Model Rules of Professional Conduct, Rule 3.7 (ABA Journal Oct., 1981). Another practical consequence of allowing this deposition to go forward as noticed was aptly stated by the *Draney* court *supra*: "The adversarial nature of litigation causes the tempers of counsel to flare all too frequently. Permitting an attorney on one side to become the inquisitor of an attorney on the other side carries a strong risk that another source of fuel is being provided." 30 F.R. Serv.2d at 961. While this Court has already noted its disagreement with the result in *Draney*, the above observation is nonetheless a valid one and is particularly pertinent to this litigation.

In summary, the Court has pointed out factors present on both sides of this delicate issue. A careful weighing of these factors leads the Court to order a compromise solution which the parties were unable to effect amicably despite admonitions to attempt to do so. That compromise is that the deposition will go forward but pursuant to Fed.R. Civ.P. 31 as opposed to Rule 30. This was precisely the method utilized by the court in a similar situation in *American Standard Inc., v. Bendix Corp.*, 80 F.R.D. 706 (W.D. Mo., W.D.1978), wherein the court stated:

> To reveal any problems of privilege or other immunity to discovery that would arise if the deposition of Mr. Moore [the attorney] were taken on oral questions, defendant Bendix was ordered to take the deposition of Mr. Moore initially on written questions. Pursuant to that order of court, defendant Bendix served notice of the taking of the deposition of Mr. Moore on 124 written questions attached to the notice in the manner prescribed by Rule 31 F.R.Civ.P.

80 F.R.D. at 708. In addition to the advantage noted by the *Bendix* court, *supra*, this method hopefully will also serve to avoid the potential flare-up of tempers which was one of the court's concerns in *Draney, supra*, and which would probably result from a direct oral confrontation of these advocates in this unusual setting. Furthermore, since plaintiff has argued that the examination of Griffin would pertain to limited areas, this method, although obviously more burdensome than an oral examination, is not unduly so. To the extent that plaintiff may construe this action to be a limitation on its right to discovery, the Court concludes that good cause for this limitation or restriction exists and the ruling is well within my authority pursuant to Fed.R. Civ.P. 26(c). *See Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979) ("With this authority at hand

[Rule 26(c)], judges should not hesitate to exercise appropriate control over the discovery process."). Therefore, an order will be entered quashing the subpoena[4] served and granting in part and denying in part the motion for a protective order in accordance with the foregoing discussion.[5] Each side will bear its own costs of this motion.

V. *Motion Of Arthur Treacher's Fish & Chips Inc. And Mrs. Paul's Kitchens For Sanctions To Compel Answers To Deposition Questions Objected To On Improper Grounds And To Compel Answers To Questions Counsel For Plaintiff Was Unable To Propound When The Deposition Was Improperly Terminated And For Reimbursement Of Reasonable Costs, Including Attorney's Fees.*

To the extent that this motion seeks answers to deposition questions allegedly objected to on improper grounds, the discussion at Part II, *supra*, is relevant here and is incorporated herein. As for the remainder of the relief sought in this motion, the Court conducted an in-chambers conference on November 4, 1981 and resolved those aspects of the motion. An Order will be entered declaring this motion mooted.

---

4. This ruling should not be construed as a denial of Arthur Treacher's right to obtain properly discoverable documents from Mr. Griffin, if they exist. The subpoena is being quashed because it is unreasonable and oppressive. If it is determined through answers to the written deposition questions, that Mr. Griffin has in his possession documents not insulated from discovery by any privilege, then these presumably will be produced.

5. The procedure to be employed is set forth in Rule 31. The Court will consider *Stipulations* of counsel seeking to modify the rule's provisions, such as the time periods set forth in Rule 31(a).