Linda C. CARL, Appellant,

v.

CHILDREN'S HOSPITAL, Appellee.

No. 93–CV–1476.

District of Columbia Court of Appeals.

Argued Dec. 7, 1994.

Decided April 10, 1995.

Michael B. Waitzkin, with whom Stacy A. Feuer and Stephen H. Marcus were on the brief, for appellant.

J. Patrick Hickey, with whom Teresa L. Diaz and Paul F. Mckey, Jr. were on the brief, for appellee.

Before FARRELL and KING, Associate Judges, and MACK, Senior Judge.

Opinion for the court by Associate Judge KING.

Concurring opinion by Associate Judge FARRELL at p. 294.

Dissenting opinion by Senior Judge MACK at p. 294.

KING, Associate Judge:

This action arises out of the termination of the employment of Linda C. Carl, a probationary part-time nurse working in the Neonatal Intensive Care Unit ("NICU"), by appellee Children's Hospital ("Children's").

## I.

Children's hired Carl on October 14, 1991, with the understanding that she would be required to complete the NICU orientation program, which consisted of both clinical and classroom components, in order to be fully qualified to care for the infants in the unit, and to work a minimum of twenty hours per week. Following the commencement of her employment, Carl twice requested, and was granted, permission to defer attending orientation classes. At the time she was terminated, she had neither completed the program

nor had she consistently met her minimum weekly hours.

In February 1992 Melinda Murray, one of Children's in-house counsel, met with Jacqueline Muir, Assistant Vice President of Nursing, to discuss Carl's employment status. This was followed by a meeting between Muir and Janice Berry, a clinical manager in NICU, to determine why Carl had failed to complete her orientation and to meet her minimum required work hours. On February 26, 1992, following these two meetings, Muir and two other Children's administrative executives met with two of Children's in-house counsel, Melinda Murray, Associate General Counsel, and Ilene Reid, Associate Counsel, to obtain legal advice concerning Carl's employment status. Thereafter, on March 20, 1992, Children's terminated Carl's employment citing both her failure to complete the NICU orientation and her failure to work the required twenty hours as reasons for the termination.

Carl maintains that she was fired because she acted as plaintiffs' expert witness in medical malpractice cases and also because of her testimony before the Council of the District of Columbia ("D.C. Council"), advocating a position antithetical to that of Children's regarding tort reform legislation. She filed a six-count complaint against Children's and Cathy J. Fonner, a nurse employed by Children's as a clinical educator, seeking recovery for economic, medical, personal, and professional damages stemming from her termination by Children's on theories of retaliatory discharge, promissory estoppel, defamation, intentional infliction of emotional distress, breach of contract, and intentional interference in contractual relations.

On December 11, 1992, the trial court dismissed Carl's retaliatory discharge, defamation, and intentional infliction of emotional distress claims, but ruled that Carl had sufficiently stated claims for promissory estoppel, breach of contract, and intentional interference in contractual relations.[1] Thereafter, the parties engaged in extensive discovery, following which Carl moved to compel Children's to answer certain deposition questions

---

1. On September 16, 1993, the parties stipulated to dismissal of the latter claim, without prejudice as to Children's, and with prejudice as to defendant Cathy J. Fonner.

and to provide certain documents relating to the February 26, 1992, meeting between Children's administrative executives and its in-house counsel. The trial court denied Carl's motion to compel discovery on the ground of attorney-client privilege. Following this ruling, Carl voluntarily dismissed her remaining claims for promissory estoppel and breach of contract in order to test the discovery ruling in this court. In this appeal, Carl seeks reversal of the trial court's dismissal of her retaliatory discharge claim and the order denying the motion to compel discovery as it relates to the promissory estoppel claim.

## II.

■ In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, we construe the complaint in favor of the plaintiff, and accept its allegations as true. *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C.1979). Thus construed, the complaint alleges that Carl was fired because she testified before the Council of the District of Columbia and served as plaintiffs' expert witness in medical malpractice cases. Carl claims her discharge contravened specific public policies adopted by the District of Columbia including: (1) a citizen's right to engage in political expression before the Council without fear of harassment or intimidation;[2] (2) a professional nurse's duty to participate in the legislative process, to advocate positions of public importance on behalf of patients, and to educate the legislature so that it can make informed public policy decisions;[3] and (3) the evidentiary rule requiring expert testimony to establish a prima facie case of negligence in a medical malpractice action.[4] The trial court, rejecting Carl's public policy arguments, dismissed the claim, apparently in reliance on *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C.1991), stating:

> I really don't think there's much dispute about what the law is here ... that's a claim that only lies if, if there's a dismissal based on the refusal to perform an illegal act. And I don't think that's what we [have] here....

The employment-at-will principle applied by the trial court is well-settled in the District of Columbia, and we have consistently held that an at-will employee may be discharged at any time for any reason, or for no reason at all. *See Wemhoff v. Investors Management Corp. of Am.*, 528 A.2d 1205, 1208 n. 3 (D.C.1987); *Taylor v. Greenway Restaurant, Inc.*, 173 A.2d 211, 211 (D.C. 1961). In *Adams, supra*, this court reiterated its commitment to this principle, but created a very narrow exception because:

> [it was] universally accepted that an employer's discharge of an employee for the employee's refusal to violate a statute is a wrongful discharge in violation of public policy[.]

*Adams*, 597 A.2d at 32 (citations omitted). We thus permitted a fired at-will employee to maintain an action against the former employer for wrongful discharge "when the sole reason for the discharge was the *employee's refusal to violate the law*, as expressed in a

---

2. Carl argues that D.C.Code § 1–224 sets forth a clear public policy promoting a citizen's right to testify before the Council. In relevant part this code section provides:

Whoever, corruptly or by threat of force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before the Council, or in connection with any inquiry or investigation being had by the Council, or any committee of the Council, or any joint committee of the Council; or whoever injures any party or witness in his person or property on account of his attending or having attended such proceeding, inquiry, or investigation, or on account of his testifying or having testified to any matter pending therein ... shall be fined ... or imprisoned....

3. This policy is supposedly grounded in the District of Columbia Health Occupations Act, Code § 2–3301.2(17)(C) (1981), defining the practice of registered nursing; and the national nursing code of conduct, CODE FOR NURSES WITH INTERPRETATIVE STATEMENTS § 11.2 (1985).

4. Carl claims the public policy is grounded in case law such as: *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990) (requiring expert testimony to establish each element of a negligence claim predicated on medical malpractice); *Eibl v. Kogan*, 494 A.2d 640, 642 (D.C. 1985) (same); *Gordon v. Neviaser*, 478 A.2d 292, 295 (D.C.1984) (same); *Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 368 (D.C.1980) (same).

statute or municipal regulation." *Id.* at 34 (emphasis added). Carl concedes, and we agree, that she does not meet this exception, but invites the court to expand *Adams* to encompass a claim such as the one alleged by her, arguing that D.C.Code § 1–224,[5] the national nursing code, and District of Columbia case law set forth clear public policy, the violation of which creates a wrongful discharge cause of action. See *supra* notes 2–4.

In four separate decisions since *Adams,* beginning with *Gray v. Citizens Bank of Washington,* 602 A.2d 1096, 1097 (D.C.), *opn. reinstated on denial of reh'g,* 609 A.2d 1143 (D.C.1992), we have considered and rejected efforts to expand the *Adams* exception to the at-will doctrine.[6] In *Gray,* we held that "only the *en banc* court may undertake the extension appellant urges on us." Therefore, we must affirm the trial court because "a division of th[is] court is not free to expand the *Adams* exception. . . ." *Gray, supra,* 602 A.2d at 1096.

### III.

The remaining issue involves the trial court's denial of a motion to compel in which Carl sought discovery of certain information, which the trial judge denied on the ground of the attorney-client privilege. As a preliminary matter, we must resolve a jurisdictional question concerning whether this issue has been preserved, and whether we can consider it on this record.

During discovery of the promissory estoppel claim, Carl undertook depositions and document discovery to determine the reasons for her termination. Having learned that the decision to fire her was made during a February 26, 1992, meeting of senior administra-

tive officials at which two of the hospital's in-house counsel were present, Carl sought to depose the administrators and attorneys who participated in the meeting. The deponents refused to answer questions or to produce documents relating to that meeting, contending that the information sought was protected by the attorney-client privilege. The trial court upheld Children's characterization of the information being sought, and denied Carl's motion to compel discovery. Carl contended that the trial court's order frustrated her ability to proceed to trial on the promissory estoppel claim, and she therefore sought to dismiss the remaining claims—promissory estoppel and breach of contract—for the purpose of taking an appeal in order to challenge that order in this court. On October 22, 1993, the parties stipulated to a dismissal with prejudice of those two claims. We will now resolve the question of whether we have jurisdiction to hear an appeal of this issue, and, if so, whether the trial court erred, as Carl contends, in denying the motion to compel. We conclude that we do have jurisdiction and that the trial court committed no error.

### A.

■ Jurisdiction is vested in this court to hear appeals from "all final orders and judgments of the Superior Court . . ." disposing of the entire case with respect to all parties. D.C.Code § 11–721(a)(1) (1989); *see Mills v. Cosmopolitan Ins. Agency,* 442 A.2d 151, 152 (D.C.1982). Although we have never been called upon to determine whether a stipulated dismissal with prejudice is an appropriate means of obtaining the finality necessary for appellate review, that procedure is an

---

5. Appellant has never contended, of course, that Children's alleged retaliatory firing of her was conduct prohibited by § 1–224. At most she contends that the statute embodies a broader legislative disapproval of any acts that punish an individual for testifying before the Council. We rejected a similar argument for an exception based on the "policies" of a statute in *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285 (D.C.1989).

6. *See also Nolting v. National Capital Group, Inc.,* 621 A.2d 1387, 1389 (D.C.1993) (same: for filing workers' compensation claim); *Elliott v. Healthcare Corp.,* 629 A.2d 6, 8–9 and n. 5 (D.C.

1993) (same: for reporting deficiencies in the maintenance of dialysis machines to management); *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 270 (D.C.1993).

In recognition of this history, Carl petitioned this court for initial hearing *en banc* arguing that judicial economy favored such a course. The court denied the petition; however, that resolution of the initial *en banc* request does not preclude Carl from again petitioning this court for a rehearing *en banc* from the decision of this division of the court rejecting any further extension of the at-will doctrine.

accepted practice in the federal court system for perfecting an appeal. *See Dorse v. Armstrong World Indus., Inc.*, 798 F.2d 1372, 1374–77 (11th Cir.1986).[7] We endorse the authorities that recognize the practice, and accordingly conclude that we have jurisdiction to hear an appeal of this case.

We are particularly persuaded by the reasoning in *Dorse*, where the court analyzed the rationale of various jurisdictions that exercised appellate jurisdiction, as well as those that refused to exercise jurisdiction, under these circumstances. The court held that it had jurisdiction because the stipulated dismissal expressly recognized the party's intent to appeal from the final judgment. *Dorse, supra*, 798 F.2d at 1377. The same is true here. Moreover, the specter of piecemeal appeals is absent because a ruling on the merits by the appellate court adverse to the appellant terminates the litigation. *See Trevino–Barton, supra*, 919 F.2d at 878. We hold, therefore, as do the federal authorities cited, that an order dismissing with prejudice all the claims of a complaint pursuant to a stipulation of dismissal for the purpose of appealing an adverse ruling is final and appealable.[8] *See also Summers, supra*, 925 F.2d at 454 (Court of Appeals for the District of Columbia Circuit recommended this approach as an appropriate means of achieving finality).

### B.

Having determined that we have jurisdiction, we now turn to Carl's contention that the trial court erred in denying her motion to compel discovery with respect to the substance of the February 26, 1992, meeting ("meeting"). The decision whether or not to grant a motion to compel discovery, pursuant to Super.Ct.Civ.R. 37(a), is within the discretion of the trial court and we will not disturb such a decision "unless there has been an abuse of discretion resulting in prejudice." *Haynes v. District of Columbia*, 503 A.2d 1219, 1224 (D.C.1986) (citation omitted). In this case, the trial court's denial of Carl's motion to compel discovery rested on the attorney-client privilege which, if sustainable, constitutes a legitimate basis for denial.[9] *See generally In re Arthur Treacher's Franchisee Litig.*, 92 F.R.D. 429 (E.D.Pa.1981) ("*Arthur Treacher's*").

The attorney-client privilege is designed to promote frank and unabridged communication between clients and attorneys in order that attorneys may render informed and sound legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). It is the oldest of the privileges for confidential communications known to the common law, *id.*, and assumes that:

> if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be more reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice.

---

**7.** *See also United States v. Procter & Gamble Co.*, 356 U.S. 677, 680–81, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958); *Trevino–Barton v. Pittsburgh Nat'l Bank*, 919 F.2d 874, 878 (3d Cir. 1990) (same: "since appellant's solicitation of the formal dismissal was designed only to expedite review of an order which had in effect dismissed appellant's complaint") (citations omitted); *Libbey–Owens–Ford, Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1034 (6th Cir.) (same), *cert. denied*, — U.S. —, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993); *Summers v. United States Dep't of Justice*, 288 U.S.App.D.C. 219, 223, 925 F.2d 450, 454 (1991) (recommending voluntary dismissal as an acceptable way to achieve finality); *but see Amstar Corp. v. Southern Pac. Transp. Co.*, 607 F.2d 1100 (5th Cir. 1979) (appellate review unavailable even if consent judgment includes express recognition of the intent of one of the parties to appeal the issue

sought to be appealed), *cert. denied*, 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980).

**8.** Reliance on the federal cases is appropriate because even though they interpret the federal statute, 28 U.S.C. § 1291 (limiting jurisdiction to "final decisions of the district courts"), this court has customarily treated that statute and our jurisdictional statute, D.C.Code § 11–721, in a similar fashion. *See United States v. Harrod*, 428 A.2d 30, 31 (D.C.1981).

**9.** Super.Ct.Civ.R. 26(b)(1) provides in relevant part:

> "Parties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party. . . ." [Emphasis added.]

*Western Trails, Inc. v. Camp Coast To Coast, Inc.,* 139 F.R.D. 4, 8 (D.D.C.1991) (citation omitted). In summary:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Sealed Case,* 237 U.S.App.D.C. 312, 316–17, 737 F.2d 94, 98–99 (1984). The privilege also protects communications from attorney to client if they "rest on confidential information obtained from the client"; or (2) if the party invoking the privilege demonstrates with reasonable certainty that "the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." *Id.* 237 U.S.App.D.C. at 317, 737 F.2d at 99 (citation omitted).

██ In her affidavit, Melinda Murray, Children's in-house counsel, stated that:

> The purpose of this meeting was for Children's Hospital to obtain legal advice regarding the status of Linda Carl's employment ... [a]ll of the people ... [present] contributed to the meeting. Both [counsel,] Ms. Reid and I[,] gave legal advice to our client, Children's Hospital. In giving this legal advice, Ms. Reid and I relied upon confidential information that we received from our client, in addition to relying on our previous experiences, backgrounds, educations, and prior professional experience with Children's Hospital.

Applying the foregoing principles, we find no abuse of discretion in the trial court's determination that Carl's proposed inquiry was barred by the attorney-client privilege.

Carl argued to the trial court that her ability to discover facts and documents relating to the meeting is critical to her ability to prove an essential element of her promissory estoppel claim. To prevail on a promissory estoppel theory, Carl must establish that Children's made a promise to her which induced her detrimental reliance, and that enforcement of that promise would prevent injustice. *See Simard v. Resolution Trust Corp.,* 639 A.2d 540, 552 (D.C.1994); *Moss v. Stockard,* 580 A.2d 1011, 1035 (D.C.1990); *District of Columbia v. McGregor Properties, Inc.,* 479 A.2d 1270, 1273 (D.C.1984). The promise which allegedly induced Carl's reliance is asserted to be contained in a memorandum from Cathy Fonner, Clinical Educator, in response to Carl's declaration that she would not be able to attend the orientation class scheduled for the end of January. The memorandum stated "it has been agreed that you will ... attend orientation classes scheduled for Tuesday, April 21, 1992." Carl contends that this statement constituted a clear and definite promise which induced her into foregoing the taking of the orientation classes in January.

Carl maintains that the reason for her discharge was not her failure to complete the NICU orientation, but her testimony before the City Council and her service as plaintiffs' expert witness. She argues that the discovery sought was not privileged because one of Children's in-house counsel, who was also present at the City Council hearing, informed Children's, at the meeting in question, of Carl's testimony and her services as an expert witness. Relying on *In re Sealed Case, supra,* Carl argues that the order denying discovery should be reversed because Children's did not demonstrate that the privilege applies to the questions at issue.[10] *In re*

---

**10.** The trial court found, and Carl does not contend otherwise, that the following constituted the questions at issue with respect to the resolution of the motion to compel:

1. What was "the issue" that was brought to your attention regarding Ms. Carl?

2. Was "the issue" the fact that Ms. Carl has testified as an expert witness or that she testified before the D.C. City Council on proposed medical malpractice legislation?

3. What was the name of the lawyer who told you about "the issue?"

*Sealed Case,* 237 U.S.App.D.C. at 317, 737 F.2d at 99 ("when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged") (citation omitted). We disagree.

In *In re Sealed Case,* an attorney testified before a grand jury on matters concerning the attorney's former corporate client, which was the target of the grand jury investigation. The attorney had served both as corporate vice president and sole in-house counsel for the corporation, and on occasions discussed business as well as legal matters with corporate representatives. *In re Sealed Case,* 237 U.S.App.D.C. at 315 n. 2, 737 F.2d at 97 n. 2. During the attorney's testimony, the corporation asserted the attorney-client privilege with respect to five different communications between the attorney and the corporate representatives. The first communication at issue, and the one on which Carl relies in her brief, involved a discussion initiated by the attorney in which the attorney disclosed to a corporate principal the contents of a conversation that he overheard at an airport regarding the corporation's antitrust compliance. The attorney testified that during the conversation with the principal, he relied upon no information from any source other than facts he obtained from the overheard conversation. Additionally, during the conversation, the principal disclosed no confidential information to counsel. *Id.* 237 U.S.App.D.C. at 317, 737 F.2d at 99–100.

Based on that testimony, the court held that no attorney-client privilege attached to the conversation because no confidential information was exchanged, and the purpose of the communication was not to obtain legal advice.

Carl's reliance on *In re Sealed Case* is misplaced, however, for several reasons. First, contrary to Carl's contention, *In re Sealed Case* does not stand for the proposition that the privilege *never* protects facts that an attorney obtains from independent sources and then conveys to the client; the court stated that the black letter law so holds, but observed that:

> [i]n practice, however, advice does not spring from lawyers' heads as Athena did from the brow of Zeus.... In a given case, advice prompted by the client's disclosures may be further and inseparably informed by other knowledge and encounters. We have therefore stated that the privilege cloaks a communication from attorney to client based, *in part at least,* upon a confidential communication to the lawyer from the client ... [and] the claimant must demonstrate with reasonable certainty that the lawyer's communication rested in *significant and inseparable part,* on the client's confidential disclosure.

*In re Sealed Case, supra,* 237 U.S.App.D.C. at 317, 737 F.2d at 99 (citations and internal quotations omitted) (second emphasis added).

4. Who attended the meeting at which "the issue" was discussed?
5. Did anyone chair the meeting?
6. Was Linda Carl the subject of the meeting or were other matters discussed?
7. Did anyone at the meeting state that Linda Carl did not take her NICU orientation in January 1992?
8. Did the lawyer for Children's Hospital give a legal opinion at the meeting?
9. Was the meeting where you heard about "the issue" the first time that you heard about Linda Carl?
10. Was a decision made at the meeting to terminate Linda Carl's employment?
11. Who decided to terminate Ms. Carl's employment?
12. Did you discuss "the issue" in subsequent meetings with Children's Hospital employees?
Carl also asked for the production of documents made in preparation for the meeting. Except for questions 4 and 8, the court held that answers to the questions and the requested documents were

protected by the attorney-client privilege and thus were non-discoverable.

It would appear that all of these questions are far more relevant to the wrongful discharge claim than to the promissory estoppel claim, if indeed, they are relevant to the latter claim at all. The trial court, however, had already dismissed the wrongful discharge count when this discovery was sought. See discussion *supra,* at page 287. The relevance issue was not raised in the trial court nor was it briefed in this court. During oral argument, however, in response to questions from the bench, Children's argued that the discovery sought was at most only "marginally relevant" to the estoppel claim. We have difficulty in discerning the relevance of these questions to the promissory estoppel claim, but do not directly decide the issue on that ground. *See Neuman v. Neuman,* 377 A.2d 393, 398 (D.C. 1977) ("rules of discovery are limited by Rule 26(b), which imposes a relevancy standard upon any matter that a party seeks to discover") (citations and footnote omitted).

Second, *In re Sealed Case* is inapposite because in that case the attorney related facts that were obtained entirely from a conversation overheard at an airport, and the client did not exchange any confidential information with the attorney during the later discussion. *Id.* at 317, 737 F.2d at 99–100. Here, however, Murray's uncontradicted affidavit established that the purpose of the meeting was to obtain legal advice concerning Carl's employment and that everyone present at the meeting participated in the discussion. During these communications, Children's management relayed confidential information to the in-house counsel, and the attorneys, in giving legal advice, relied upon information they had received from their client and other sources including their previous experiences, backgrounds, and prior professional relationship with the client. Whatever the attorneys conveyed to Children's was intimately related to the information received from the client and was therefore privileged. *See Brinton v. Department of State,* 204 U.S.App.D.C. 328, 332, 636 F.2d 600, 604 (1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981); *See also Upjohn, supra,* 449 U.S. at 390 (privilege protects client's disclosure of confidential information to lawyer to enable lawyer to give advice).

Third, an examination of the questions at issue reveals that they could not be answered without disclosing privileged information. The questions seek to elicit information concerning topics of discussion or the subject matter of the meeting, see *supra* at footnote 8, which is privileged. *See also Arthur Treacher's, supra,* 92 F.R.D. at 435 (declining to follow the view that the privilege would never operate to preclude inquiry into the subject matter of privileged communication); *but see J.P. Foley & Co. v. Vanderbilt,* 65 F.R.D. 523, 526 (S.D.N.Y.1974) (privilege "does not cover attorney's communications—whether in the form of information or advice—" which are not based upon confidential

communications of the client) (citations omitted).[11] From this record, we are persuaded that Children's satisfied the *Sealed Case* exception by demonstrating that the lawyers' communication was inextricably intertwined with the Children's confidential disclosure. *See Western Trails, supra,* 139 F.R.D. at 8 (privilege protects communication from attorney to client if inextricably bound to confidential client communication).

■ Finally, we must weigh the interests involved, balancing the importance of the attorney-client privilege against Carl's need for the information, considering such factors as whether the information sought goes to the heart of, or is crucial to, Carl's discovery claims, and the issues framed by the pleadings. *See Greater Newburyport Clamshell Alliance v. Public Serv. Co. of N. H.,* 838 F.2d 13, 20 (1st Cir.1988); *see generally Plough Inc. v. National Academy of Sciences,* 530 A.2d 1152, 1157–60 (D.C.1987). Where the information is crucial to the case and the factors favoring the privilege minimally outweigh the need for disclosure, the judge may allow discovery. *Greater Newburyport, supra,* 838 F.2d at 20 (the privilege ends at point where plaintiff can show that without the information sought, it would be virtually impossible to prosecute the claim.) Where, however, any response would be only marginally relevant, then the judge does not abuse his or her discretion in deciding in favor of the privilege. *Id.* ("a court should begin its analysis with a presumption in favor of preserving the privilege"). Here, the promissory estoppel claim was the only viable claim remaining in the case when the trial court denied the motion to compel, and as we previously observed, any responses to the questions propounded would be, at best, only marginally relevant to that claim.[12] In short, Children's has demonstrated that the discovery sought is privileged, while Carl has not established any compelling need for the

11. In *Arthur Treacher's,* the court criticized this view on the basis that (1) it would be elementary to hone the questions to require greater and greater specificity regarding the matter discussed so as to avoid altogether the effectiveness of the privilege; and (2) the responses would be of little benefit to an opponent or the court if they were

limited to the most general terms because the privilege would preclude further questions going to the content of the discussion. *Arthur Treacher's,* 92 F.R.D. at 435.

12. See note 10, *supra.*

discovery sufficient to overcome the attorney-client privilege. *See Greater Newburyport, supra,* 838 F.2d at 19 ("while disclosure might be of some indirect, casual or remote benefit to the defendant ... such elusive benefit is not weighty enough to overcome the policy against disclosure") (quoting *Mitchell v. Roma,* 265 F.2d 633, 637 (3d Cir.1959)). We therefore hold that the trial court did not abuse its discretion in striking that balance in favor of non-disclosure.

*Affirmed.*

FARRELL, Associate Judge, concurring:

In *Elliott v. Healthcare Corp.,* 629 A.2d 6, 8–9 (D.C.1993), this court recently stated: [T]he District of Columbia does not recognize the tort of wrongful or abusive discharge of an employee at will, other than by a very narrow public policy exception not applicable in this case. *See Adams v. George W. Cochran & Co.,* 597 A.2d 28, 34 (D.C.1991) (former employee may sue former employer for wrongful discharge based on employee's refusal to violate statute or municipal regulation); *Ivy v. Army Times Publishing Co.,* 428 A.2d 831, 834 (D.C.1981) (en banc).[5]

[5] Broad "public policy" exceptions to the general rule of at-will employment have been urged upon this court before, and rejected by this court, *id.* 428 A.2d at 833–35, until the narrow exception in *Adams, supra,* 597 A.2d at 34.

The law in this jurisdiction is thus clear: unless an employee is fired for refusing to violate a statute or municipal regulation, no appeal to "public policy" will suffice to create an exception to the at-will doctrine. The court en banc, of course, is free to revisit that rule and decide that in the future any firing that results in suit will be tested for whether it "tends to be injurious to the public or against the public good." *Post* at 297, Mack, J., dissenting (quoting *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 871 (Mo.Ct.App. 1985)). And, undoubtedly, the Council of the District of Columbia will continue its work of

1. See D.C.Code §§ 1–616.3 (1992); 1–2525, –2556; 11–1913 (1989); 36–220.9, –220.10 (1993); 36–342; 36–1217; 36–1307, –1310.

2. It is impossible to read *Gray* and reasonably conclude, as the dissent would, that a majority

"[b]alanc[ing] the interests of the employee, the employer, and the public," *post* at 297 (quoting *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505, 511 (1980)), and enacting specific prohibitions on retaliatory discharge in some areas or as to some classes of employees but not others.[1]

But, contrary to our dissenting colleague's opinion, what a division of this court may not do is consider each new proffered public policy exception and decide for itself whether to expand the *Adams* opening still further. Our decisions in *Elliott, supra,* as well as *Gray v. Citizens Bank of Washington,* 602 A.2d 1096 (D.C.1992), and *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265 (D.C.1993), foreclose any such three-judge attempt to open wide a door we have—with but a single exception—kept resolutely shut.[2] It may be that the policy appellant articulates, *viz.,* deterring intimidation (by threat of firing) of employees who voluntarily testify before legislatures or government bodies, will be compelling enough to cause the major revision of our law governing employee discharges that appellant seeks; time will tell. But what is certain, in light of our post-*Adams* cases, is that only the full court can make that judgment.

MACK, Senior Judge, dissenting:

I would consider the merits of appellant's allegation that she had been discharged by appellee in violation of public policy. I would remind my colleagues first as to the law and the facts. We are all in agreement today that, in reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, we accept the plaintiff's allegations as true; it necessarily follows that we are considering whether Ms. Carl can be lawfully fired because she testified before the Council of the District of Columbia and appeared in District of Columbia Courts as an expert witness for plaintiffs in medical malpractice cases.

there intended future divisions to be free to adopt new exceptions to the doctrine.

Further, I would remind my colleagues of the issues, the first being, may this court judicially recognize an exception to the employment-at-will doctrine? The obvious answer is "yes" since we already have done so. *See Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C.1991) (finding that an employee was wrongfully discharged when the employee refused to violate the law). I depart from my colleagues in responding to a second issue: are we free as a panel to consider the allegations of wrongful discharge which we must accept as true? Of course we are.

As to my colleagues' reliance on our vacated and reinstated panel decision in *Gray v. Citizens Bank of Washington*, 602 A.2d 1096–97, *opinion reinstated on denial of reh'g*, 609 A.2d 1143 (D.C.1992), I view the language, that only the *en banc* court can extend an exception to the at-will doctrine, as the pronouncement of only one member of this court.[1] Even were this not so, this conclusion would not, could not, pass muster. It is contrary to the very essence of the common law as an evolving component of legal development and reasoning. A panel of our court cannot "legislate" to conclude that only our court *en banc* can expand or limit a common-law doctrine. Legal precedent is vital to the court system; however, it stands to reason that no panel of this court is in a posture to bind all future panels on future cases with very different facts and circumstances. Such broad *dicta* is beyond a panel's power and is suspect as precedent. I would ignore the *dicta*, pronounced in one of the three opinions of the panel[2] in *Gray*, and rule on the merits in this case. I would conclude that firing someone for testifying before the City Council on tort reform violates a clear mandate of public policy and

therefore would create another limited wrongful discharge cause of action as an exception to the employment-at-will doctrine. I would remand for further consideration the question of whether discharging an employee for testifying as an expert in medical malpractice cases violates a clear mandate of public policy. Under either cause of action, appellant could have the opportunity of attempting to show that the termination was retaliatory and a defense pretextual.

## I.

Today the majority states that "In *Gray*, we held that 'only the *en banc* court may undertake the extension appellant urges on us.' Therefore, we must affirm the trial court because 'a division of th[is] court is not free to expand the *Adams* exception. . . .'" Majority op. at 289. In my view, both the lead opinion in *Gray* and today's decision cannot operate to bind all future panels of this court from deciding the merits of expanding the public policy exceptions to the employment-at-will doctrine. Not only are these opinions out of line with our prior precedent in this area of law, but both courts are out of bounds with historical precedent and the development of the common law.

The employment-at-will doctrine is judicially imposed and was created by default from the evolution of the common law. As we have stated "a contract for employment of indeterminable length and where there is *no statute to the contrary*, the contract is terminable by either employer or employee at will without liability to the other party." *Lyons v. Capital Transit Co.*, 62 A.2d 312 (D.C.1948); *see also Pfeffer v. Ernst*, 82 A.2d 763, 764 (D.C.1951). As a judicially created and imposed doctrine the courts should be

---

1. In *Gray*, one member of the panel (concurring in affirmance of the trial court's dismissal of a complaint) agreed it would be "more seemly" to act *en banc*, 602 A.2d at 1099; another, relying on the specific factual allegations in that case, concluded that it was anything but a "suitable vehicle" for *en banc* consideration. *Id.* at 1100–02.

2. In *Gray*, a petition for rehearing *en banc* was heard, and the panel decisions were vacated. 609 A.2d 1143. A majority *en banc* vote, reinstating the panel's decision, is silent as to why a

petition for rehearing was "improvidently granted." Three dissenting judges stressed the importance of the public policy exception sought in the facts of that case.

In the instant case, Ms. Carl sought an initial rehearing *en banc*. Appellee points to a purported "concession" by Ms. Carl that if that rehearing was denied, it would be "inappropriate" for a panel to expand the law of wrongful discharge—a position which is antipathetic to the appellate process.

free to modify the doctrine as the development of the common law would necessitate. As one court has stated:

> While it is the function of courts to interpret rather than make the law, it must nevertheless be borne in mind that the common law is not a collection of archaic, abstract legal principles ...—it is a living system of law that, like the skin of a child, grows and develops as the customs, practices and necessities of the people it was adopted for change. The common law had its genesis in the customs and practices of the people, and its genius, as many of the country's greatest jurists and legal scholars have pointed out, is not only its age and continuity, but its vitality and adaptability.

*Sides v. Duke University,* 74 N.C.App. 331, 328 S.E.2d 818, 827, *review denied,* 314 N.C. 331, 333 S.E.2d 490 (1985).

This court has never before stated that a common law doctrine cannot be modified, expanded or contracted without *en banc* consideration. In fact three-judge panels of this court have often over time modified, expanded or contracted common law doctrines in the area of torts and contracts. *See, e.g., District of Columbia v. Owens–Corning Fiberglas Corp.,* 572 A.2d 394, 403–05 (D.C.1989) (recognizing municipal immunity from the running of statutes of limitations and repose because of "the artifact of a royal prerogative"); *Rong Yao Zhou v. Jennifer Mall Restaurant,* 534 A.2d 1268, 1276 (D.C.1987) (holding that a violation of the D.C.Code § 25–121(b) by serving a person already intoxicated "renders the tavern keeper negligent *per se*"); *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1357 (D.C.1978) (accepting "that the law of products liability applies not only to the sale of goods, but also to the sale of newly constructed homes"); *Matthews v. District of Columbia,* 387 A.2d 731, 734 (D.C.1978) (adopting the "recognized common law duty owed to prisoners by penal authorities is one of reasonable care in their protection and safekeeping"); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 289 (D.C.1977) (recognizing the tort of interference with prospective advantage); *Gaither v. District of Columbia,* 333 A.2d 57, 60 (D.C.1975) (recognizing "that there is a common law duty owed to the prisoner, by his guards and their superiors, which requires that they exercise reasonable care in the protection and safekeeping of the prisoner"); *Cottom v. McGuire Funeral Serv., Inc.,* 262 A.2d 807, 809 (D.C.1970) (expanding products liability for a defective product to include recovery by a nonpurchaser against the wholesaler).

The employment-at-will doctrine should be no exception to the power of each panel of this court to do justice within the confines of precedent and legal reasoning. Prior to today, no other three-judge panel has failed to at least implicitly address the merits of expanding or creating a public policy exception to the employment-at-will doctrine. *See, e.g., Elliott v. Healthcare Corp.,* 629 A.2d 6, 8–9 (D.C.1993) (rejecting expansion of public policy exception to employment-at-will doctrine); *Nolting v. National Capital Group, Inc.,* 621 A.2d 1387 (D.C.1993) (same); *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 269 (D.C.1993) (same); *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285 (D.C.1989) (same). Three of these cases were decided after *Gray* and do not suggest that a panel is prohibited from recognizing a public policy exception; each rather rejects the need for an expansion on the facts of each case. In fact, the only exception to the employment-at-will doctrine in this jurisdiction was adopted by an opinion of a three-judge panel, not the court *en banc. Adams, supra* (recognizing an exception for at-will employment doctrine when employee refuses to violate the law).

## II.

In *Adams* this court recognized a tort for wrongful termination under a very limited public policy exception to the at-will employment doctrine when an employee is discharged for refusing to violate a statute. 597 A.2d at 32. Although this court has not further defined or modified the types of situations covered by the limited public policy exception, other jurisdictions have defined the types of situations covered by a more expansive public policy exception. In fact, a majority of jurisdictions permit suits for re-

taliatory discharge when the discharge violates a clear mandate of public policy as expressed in the jurisdiction's constitution, judicial decisions, statutes and regulations. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 106–07 & n. 3 (Colo.1992) (noting thirty-seven jurisdictions with a public policy exception to the at-will employment doctrine).

The rationale for allowing a cause of action for wrongful discharge has been explained as follows:

> [I]n a civilized state where reciprocal legal rights and duties abound the words "at will" can never mean "without limit or qualification," … for in such a state the rights of each person are necessarily and inherently limited by the rights of others and the interests of the public. An at will prerogative without limits could be suffered only in an anarchy, and there not for long—it certainly cannot be suffered in a society such as ours without weakening the bond of counter balancing rights and obligations that holds such societies together. Thus, while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy.

*Sides, supra,* 328 S.E.2d at 826.

" 'Public policy' is that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good." *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 871 (Mo.Ct. App.1985). The sources of public policy "include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (1980).

Among the public policy exceptions recognized by courts that allow an employee to sue for retaliatory discharge include: (1) jury duty, *e.g., Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975); (2) whistle blowing or threatened reporting of a statutory violation, *e.g., Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980); *Boyle,*

*supra; McQuary v. Bel Air Convalescent Home, Inc.,* 69 Or.App. 107, 684 P.2d 21 (1984); (3) cooperating with a law enforcement investigation, *e.g., Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill. Dec. 13, 421 N.E.2d 876 (1981); *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 575 N.E.2d 1107 (1991); (4) exercising a statutory right or privilege such as filing a worker's compensation claim, *e.g., Niesent v. Homestake Mining Co.,* 505 N.W.2d 781 (S.D.1993); (5) exercising a constitutional or political right such as refusing to participate in employer's lobbying effort and privately stating opposition to company's political stand or running for political office, *e.g., Novosel v. Nationwide Ins. Co.,* 721 F.2d 894 (3d Cir.1983); *Davis v. Louisiana Computing Corp.,* 394 So.2d 678 (La.Ct.App.), *writ denied,* 400 So.2d 668 (La.1981); (6) acting consistently with a professional code of ethics, *e.g., Pierce, supra; Kalman v. Grand Union Co.,* 183 N.J.Super. 153, 443 A.2d 728 (App.Div.1982); (7) being fired because of race or gender, *e.g., Lockhart v. Commonwealth Educ., Sys. Corp.,* 247 Va. 98, 439 S.E.2d 328 (1994); (8) refusing to testify falsely at a trial or administrative hearing, *e.g., Sides, supra;* and (9) refusing to violate a law, *e.g., Adams, supra; D'Agostino v. Johnson & Johnson, Inc.,* 133 N.J. 516, 628 A.2d 305 (1993). Thus, many courts have recognized a more expansive exception to the rule of employment-at-will than this court did in *Adams* based on a broad public policy exception.

In adopting a cause of action for wrongful discharge based on a clear mandate of public policy courts should:

> [B]alance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

*Pierce, supra,* 417 A.2d at 511. I would follow the majority of jurisdictions in this

country and recognize a general action for wrongful discharge when contrary to a clear mandate of public policy.

Here Carl claims she was discharged because she testified before the City Council on tort reform issues contrary to the interests of her employer and because she testified for plaintiff's in medical malpractice cases. Carl raises three public policies that her discharge contravened:

(1) a citizen's right to engage in political expression before the D.C. City Council without fear of harassment or intimidation; (2) a professional nurse's duty to participate in the legislative process, to advocate positions of public importance on behalf of patients and to educate the legislature so that it can make informed public policy decisions; and (3) the judicially-created evidentiary rule requiring expert testimony to establish a *prima facie* case of negligence in a medical malpractice action.

## A.

Specifically Carl points to D.C.Code § 1–224 (1981) which states that

Whoever, corruptly or by threat or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before the Council ... shall be fined not more than $2,000 or imprisoned not more than 2 years, or both.

Clearly, the Council has expressed a desire that all citizens be free to exercise their right to participate in the legislative process without obstruction or intimidation. A fully informed legislative process is vital to the creation of sound public policy consistent with the public interest. D.C.Code § 1–224 makes it a crime to try to intimidate a witness. Dismissing a witness from employment because of such testimony will have a deterrent effect on potential future witnesses. Allowing someone to be fired for helping to inform the legislative process is contrary to the clear mandate of public policy implicitly recognized in D.C.Code § 1–224.

In *Bishop v. Federal Intermediate Credit Bank of Wichita*, 908 F.2d 658 (10th Cir. 1990), the court allowed a suit when the plaintiff alleged discharge from employment for testifying before a congressional committee. The court supported the public policy exception on a state statute affording witness immunity from future criminal prosecution for legislative testimony:

Recognition of the exception supports our tradition of free, direct and truthful testimony at legislative hearings, a policy Oklahoma has implicitly recognized. *Cf.* Okl. Stat.Ann. title 12, § 411 (1988) ("No testimony given by a witness ... before any committee ... shall be used as evidence in any criminal proceeding against him in any court...."). Presumably, Oklahoma would extend the same protections out of comity to hearings conducted under congressional authority. Accordingly, we hold that truthful testimony at congressional hearings is "an act consistent with a clear and compelling public policy" that justifies a public policy exception to the at-will employment doctrine.

Id. at 662–63.

The Oklahoma statute in *Bishop* granted criminal immunity to a witness. Here, D.C.Code § 1–224 makes it a crime to intimidate a witness. Employees should not be forced to choose between losing their jobs or engaging in the political right and public policy necessity of providing the legislature with important information regarding their legislative responsibilities. The public's need for an informed legislative process not subject to influence, intimidation or any other impediment is a vital public policy. Dismissing an employee for testifying before the legislature clearly impedes future testimony. Here we have even a stronger indication of public policy than the court had in *Bishop* under the Oklahoma statute.

Carl also asserts that one of the obligations of a professional nurse is as an advocate on issues of public health. Included in this obligation is public education and in this case political expression in the form of educating the City Council on a matter of medical importance—tort reform and medical care. Carl points to the Health Occupations Act, D.C.Code § 2–3301.2(17)(C), and the national nursing code of conduct, American Nurses Association, *Code for Nurses with*

*Interpretative Statements* § 11.2 (1985), as revealing a public policy that nurses express their views and participate in the political process on issues regarding public health.

Specifically, the Health Occupations Act defines the "practice of registered nursing" as the "performance of services, counseling, and education for the safety, comfort, personal hygiene and protection of patients, the prevention of disease and injury, and the promotion of health in individuals, families and communities." D.C.Code § 2–3301.2(17)(C). Thus, there is some statutory support for the assertion that nurses should promote public health by educating the community. Other jurisdictions have grounded public policy exceptions to at-will employment on similar state health and nursing statutes. *See Kirk v. Mercy Hosp. Tri-County,* 851 S.W.2d 617, 620–23 (Mo.Ct.App. 1993) (recognizing wrongful discharge claim by nurse who reported improper treatment of patient based on public policy in nursing law); *Winkelman v. Beloit Memorial Hosp.,* 168 Wis.2d 12, 483 N.W.2d 211 (1992) (allowing wrongful discharge suit when nurse refused to be reassigned to area of hospital she felt she was not qualified for when administrative rule states a nurse should not perform services she is not qualified for by education, training or experience).

Carl also relies upon the American Nurses Association, *Code for Nurses with Interpretive Statements* § 11.2, which directs nurses to promote "the welfare and safety of all people" through "active participation in decision making in institutional and political arenas." Other courts have concluded that codes of professional conduct are a source of public policy in the wrongful discharge context when the ethical code provision serves the public interest as opposed to the interest of the professional. *See Pierce, supra,* 417 A.2d at 512 (recognizing possible public policy interest arising from medical Hippocratic oath or other codes of professional ethics); *Kalman, supra,* 443 A.2d at 730–31 (recog-

nizing wrongful discharge cause of action based on pharmaceutical code of ethics).

Both the Health Occupations Act and the *Nurses Code* provide a strong policy that nurses should inform and educate the public and legislative process in regards to matters of public health. Tort reform legislation presumably would have an impact (positive or negative) on public health. The requirement in the *Nurses Code* is not designed to serve only in the interests of the profession, but rather is designed to educate the public—a clear interest of the public. In addition, the Health Occupations Act clearly wants health officials to educate the public on matters of public health. Testifying before the legislature or City Council is one of the best ways to educate the public regarding matters of public health. Therefore, both the health statute and the code of professional ethics provide a sufficient grounding for pursuing a wrongful discharge claim based on a clear mandate of public policy.

Unencumbered expert testimony before the City Council on a matter of public importance, such as tort reform, is of vital importance to our democratic process and informed decision making by our elected officials. Retaliatory discharge for speaking on issues of public health and safety should not be impeded by an employer especially when a professional feels obligated to voice an opinion on matters within his or her expertise and experience and when legislative statutes and a professional code of ethics encourage the professional to inform and educate the public on such matters. A retaliatory firing for testifying as a professional nurse on tort reform is contrary to the policies articulated in D.C.Code § 1–224, the Health Occupations Act and the *Nurses Code.* These statutes and ethical code create a clear mandate of public policy for informed expert medical testimony before a legislature on matters of public health not subject to influence, intimidation or any other impediment. Therefore, I would recognize an exception to the employment-at-will doctrine based on this clear mandate of public policy.[3]

---

**3.** There is also some basis to find an exception to the employment-at-will doctrine on public policy grounds from the First Amendment right to free expression. *See Novosel, supra,* 721 F.2d at 898–

900 (finding dismissal of employee based on refusal to participate in political lobbying on behalf of employer a violation of First Amendment values); *Lenzer v. Flaherty,* 106 N.C.App. 496, 418

## B.

Carl also asserts that she was discharged for providing expert advice and testimony on behalf of plaintiffs in medical malpractice cases. Thus, she argues that her discharge contravenes a judicial rule and the integrity of the judicial process. Our decisions require that a plaintiff present expert testimony to establish the applicable standard of care in a medical malpractice case where the medical procedure is beyond the ken of the average layman. *Eibl v. Kogan,* 494 A.2d 640, 642 (D.C.1985) (per curiam). Judicial opinions are a recognized source of public policy in the employment-at-will context. As one court has noted sole reliance on legislative pronouncements would "eliminate aspects of the public interest which deserve protection but have limited access to the political process." *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1043 (Utah 1989).

In *L'Orange v. Medical Protective Co.,* 394 F.2d 57 (6th Cir.1968), the court was confronted with the issue of whether a dentist could lose his malpractice insurance for testifying for a plaintiff in a malpractice suit against another dentist. The two dentists resided in the same city and had the same malpractice insurance carrier. The terms of the insurance contract had a cancellation clause that was almost equivalent to an at-will employment situation—the insurance could be cancelled upon ten days notice for any reasons as long as the unearned premium was returned. However, the court noted that Ohio courts have determined that an insurance policy is a voluntary contract "subject to the public policy of the state." *Id.* at 59. Thus, the court had to define public policy in a professional testimony case.

The *L'Orange* court discussed the public policy of medical expert testimony as follows:

> The virtual necessity of expert testimony in medical malpractice cases plus the recognized reluctance of members of the medical profession to give such testimony render the public policy against intimidating a

witness even more compelling in the present case.

It cannot be doubted that the effective administration of justice requires that expert testimony be available in malpractice actions.

\* \* \* \* \* \*

> A member of the medical profession could hardly be expected to appear in court and testify for a plaintiff in any litigation if the penalty might be the cancellation of his own malpractice insurance. It manifestly is contrary to public policy to permit an insurance company to use policy cancellation as punishment against a doctor or dentist who appears as a witness to protect the rights of a plaintiff who has been wronged by another member of the profession. If the insurance industry can use the cancellation procedure to keep members of the medical profession from testifying as witnesses, malpractice litigation can be stifled.

*Id.* at 61–62 (citations and footnotes omitted). This same public policy analysis would seem applicable in the retaliatory discharge context.

A medical professional should not be intimidated from testifying in court cases by fear of being fired by his or her employer. Experts do help with the administration of justice and in allowing individuals to recover for tortious conduct. With more and more medical professionals being employed by large corporations, health maintenance organizations, and hospitals, an employer or group of employers could effectively intimidate a medical professional from testifying for a plaintiff by threatening dismissal.

However, experts are hired and paid for testifying by plaintiffs, defendants, or their counsel. Testifying in a tort case is not a whistleblowing activity or an activity designed to educate the public regarding public health. If a professional is required to be in court under a subpoena, public policy would

S.E.2d 276, 287 (recognizing public policy exception based on free speech guarantees when a physician's aide reported patient abuse), *review and supersedeas denied,* 332 N.C. 345, 421 S.E.2d 348 (1992); *Schultz v. Industrial Coils Inc.,* 125 Wis.2d 520, 373 N.W.2d 74, 76 (App.1985) (designing balancing test based on free speech claim in wrongful discharge case when employee wrote letter to local newspaper criticizing employer).

dictate that he or she not be fired for speaking the truth, or for refusing to alter truthful testimony regarding his or her involvement while on duty. *See Sides, supra* (finding wrongful discharge cause of action when nurse discharged for refusing to testify falsely or incompletely at medical malpractice trial). However, where the professional is hired to testify against his or her employer, as opposed to another entity, no judicially-created evidentiary requirement on expert testimony creates a clear mandate of public policy in the wrongful discharge context.

The record in this case is unclear on the specific nature of the testimony, its involvement with Children's Hospital, or other hospitals, and its production for payment or under subpoena. On remand these factors would be critical on whether there is a cause of action for retaliatory discharge based on a clear mandate of public policy. Thus if Carl testified under subpoena she would be immunized against retaliation for truthful testimony regardless of whether the testimony was against the interest of Children's Hospital or some other medical entity. However, if Carl was hired to testify by a party other than her employer, any testimony against the direct interest of Children's Hospital might place her beyond protection. Such a determination would likely turn on whether the suit was against Children's Hospital or another entity. Therefore, I would remand this aspect of the case for further discovery of the circumstances of her testimony in the medical malpractice cases.

### III.

In conclusion, I gather that we can all agree that the employment-at-will doctrine protects the interest of both the employer and the employee. The right of termination is mutual to both; discharge is not so mutual.[4] To prevent a shocking discharge in derogation of public policy, either statutorily or judicially-imposed exceptions have evolved.

The adjectives "retaliatory" and "pretextual," as applied to a discharge, cry out for a resolution when an employee has done nothing more than to perform a public service—a service protected against interference by a criminal statute. I would reverse summary judgment on the wrongful discharge claim to permit Ms. Carl to prove, if she can, that she was fired for testifying before the Council or under immunized circumstances for testifying as a plaintiff's expert, at which time presumably appellee could defend its position that she was terminated for legitimate reasons.[5]

---

4. I notice that the word "termination" is used by my colleagues in advancing the Hospital's version of the facts; "fired" is used to describe the allegations of Ms. Carl's complaint, which the majority concedes it must accept as true.

5. As to the issue of the denial of discovery, I agree with my colleagues that we have jurisdiction to review the trial court's denial of the motion to compel. I am not so sanguine as to say that I agree with their holding with respect thereto (in view of the limited discovery sought as well as its relevancy to retaliation charge).