Bettie SORRELLS, Appellant,

v.

GARFINCKEL'S, BROOKS BROTHERS, MILLER & RHOADS, INC., Appellee.

Barbara WILLIAMS, Appellant,

v.

Bettie SORRELLS, Appellee.

Nos. 87–944, 87–1029.

District of Columbia Court of Appeals.

Argued June 9, 1989.
Decided Sept. 28, 1989.

Martin F. McMahon, with whom Steven J. Kramer and Cynthia L. Clark were on the brief, for Bettie Sorrells, appellant in No. 87–944[1] and appellee in No. 87–1029.

D'Ana E. Johnson for Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc., appellee in No. 87–944, and for Barbara Williams, appellant in No. 87–1029.

Before ROGERS, Chief Judge, and MACK and TERRY, Associate Judges.

TERRY, Associate Judge:

Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc., operates a chain of department stores in the Washington area known as Garfinckel's. These appeals arise from an action filed by Bettie Sorrells against Garfinckel's, her former employer, Barbara Williams, her former supervisor, and Harry Vandevort, the vice president for personnel at Garfinckel's, who fired Sorrells at Williams' urging. The original complaint against Garfinckel's alleged, *inter alia,* a "wrongful discharge." Summary judgment was granted on this claim in favor of Garfinckel's. Thus in No. 87–944 appellant Sorrells contends that the trial court erred in ruling as a matter of law that wrongful discharge is not actionable in the District of Columbia. Bound by long-established precedent, we affirm that ruling.

Sorrells also sued two Garfinckel's employees, Vandevort and Williams, for intentional interference with her contract of employment with Garfinckel's. The trial court granted a directed verdict for Vandevort at the close of the plaintiff's case but allowed the claim against Williams to go to the jury, which returned a verdict in Sorrells' favor.[1] Williams raises two issues in her appeal, No. 87–1029. First, she contends that as a matter of law she cannot be considered a third party for purposes of intentional interference with contractual relations because she was Mrs. Sorrells' supervisor. In the alternative, Williams claims that her conduct was privileged and that there was insufficient evidence to allow the jury to determine whether the privilege was vitiated by malice. We reject both arguments and affirm the judgment against Williams.

I

Before Mrs. Sorrells was hired by Garfinckel's, she worked for Woodward & Lothrop, another department store chain, selling the Frances Denney line of cosmetics. In April 1978 she went to work for Garfinckel's. It is undisputed that Sorrells was not hired for a specific term, and that she was therefore an at-will employee. Once hired, she was allotted a counter from which to sell the Frances Denney line.

While negotiating for employment with Garfinckel's, Mrs. Sorrells made clear that she depended heavily on the use of the telephone to stay in contact with her regular customers, in order to generate sales. Accordingly, a special telephone line was installed at Garfinckel's for her use. Sorrells kept a register comprised of about 1500 cards which contained past customers' names and their cosmetic needs. She relied heavily on the telephone to maintain contact with her former customers from Woodward & Lothrop, encouraging them to buy from her now at Garfinckel's. While off duty, Mrs. Sorrells made calls from her home to keep her clientele advised of her position at Garfinckel's and to urge them to shop there. She also took home her stock book, which showed what Denney products were in stock at Garfinckel's, and in what amounts. Using the stock book, Sorrells would know how much of a product was available, if any, and so would be able to make telephone sales from home.

Mrs. Sorrells testified that sometime in the fall of 1978, at the direction of Barbara Williams, her sales counter was moved to a location which, in Sorrells' view, was less desirable. At the same time Sorrells was forbidden by her supervisor, Williams, to

---

1. Sorrells does not contest the directed verdict granted to Vandevort. Sorrells also sued Williams for intentional infliction of emotional distress. The trial court granted a directed verdict for Williams on this count, which Sorrells does not challenge on appeal.

use the telephone at work, a restriction which largely destroyed her ability to generate sales. In an effort to compensate, Mrs. Sorrells attempted to make all her calls from home, after work.[2] Sorrells testified that all the other salespersons were allowed the unrestricted use of telephones during this period. In December of 1978 Mrs. Williams repeated her direction to Mrs. Sorrells that she not use the telephone, except in Williams' office, and at times which were not busy. This prohibition on the use of the telephone continued for five to six months even though Mrs. Sorrells offered to have a phone installed at her own expense. Ultimately, Mr. Vandevort, the personnel manager, decided there was no justification for the prohibition on Sorrells' use of the telephone and reinstated her telephone privileges. Williams denied to Vandevort that she had restricted Sorrells' use of the phone.

Additionally, Sorrells testified that Williams once accused her of stealing an associate's customer, which Mrs. Sorrells denied. Later Williams told her that she would never be afforded more counter space at Garfinckel's. Mrs. Sorrells also said that she was initially provided with a stool on which to sit, and that she had been told by her doctor to have such a stool available because of a medical problem affecting her leg. Mrs. Sorrells had previously given her personnel manager at that time, Karen Peel, a copy of a letter from her doctor prescribing a stool. In April of 1979, however, her stool was taken away for five days at Williams' direction, causing her considerable pain and discomfort, even though Williams knew she needed the stool.[3] When Sorrells complained, Williams said she did not want Mrs. Sorrells sitting down on the job and told her to have an operation if her feet hurt.

In January of 1979, Sorrells testified, Williams took her stock book away and kept it thereafter in her office, forbidding Sorrells to take it home. This further inhibited Mrs. Sorrells' sales because at home she had no way of knowing what products were in stock and available for sale. Other employees were not similarly restricted; some of them, in fact, took their stock books home. In the spring of 1979 Williams told Sorrells that she could no longer make transfers of Frances Denney products from other Garfinckel's stores when supplies got low at the main downtown store where she worked. Mrs. Sorrells spent seven or eight months without her stock book, and two or three months without being able to transfer merchandise between stores. Sorrells also said that Williams frequently removed promotional items which she had set up on the counter, further inhibiting sales.[4] At the same time, Williams set totally unrealistic sales goals for her and in April 1979 threatened to take "action" against her on June 1. Williams also criticized her for her personal appearance.

Sorrells testified that Williams incorrectly logged in the times when Sorrells arrived at and departed from work. Sorrells reported this to Mr. Vandevort and threatened to go to the National Labor Relations Board. Mrs. Williams then prohibited her from taking Saturdays off as a direct result of her complaining to Mr. Vandevort about the time sheets. Sorrells also testified that Williams disparaged the Frances Denney line in front of customers, that Williams unfairly gave her a poor performance review in July 1979, and that she was not recommended for a raise despite the fact that she had netted over $37,000 in sales. Mrs. Sorrells wrote a letter to Vandevort requesting "an honest, fair, unbiased opinion" of her work, in lieu of Williams' performance review. Vandevort met with Sorrells, but did not act on her request.

2. Mrs. Sorrells' husband, Don Sorrells, testified that she "became obsessed with doing work at home" during this period. She would spend four hours a night calling customers and discussing with them the products she had available.

3. A co-worker testified that the stool was removed by Mrs. Williams' assistant on one of Mrs. Sorrells' days off.

4. This testimony was corroborated by a co-worker, Veronica Neal.

When Williams falsely accused Sorrells in front of Mr. Vandevort of purchasing merchandise for resale from home, Vandevort told Williams "to stop nit-picking [Mrs. Sorrells] and to get off [her] back." When Sorrells later accused Williams of harassing her in an effort to force her to quit, Williams replied, "No, just wait until June 1st, I'll take my action." Sorrells also complained to Vandevort that Williams had accused her of trying to return merchandise she had not purchased, buying merchandise for resale, and treating her on one occasion as if she were trying to shoplift merchandise from the store.

On May 12, 1980, Mr. Vandevort called Mrs. Sorrells to his office and told her, "We don't want you here. I want you to resign." When she refused to resign, he fired her in the presence of Mrs. Williams and another employee. The reason he gave for firing her, according to Sorrells' testimony, was that she had failed to take lunch hours and failed to perform her duties to the satisfaction of Garfinckel's and Frances Denney. About five minutes later, as she was cleaning out her locker, Mrs. Sorrells overheard Mrs. Williams say, "I finally accomplished what I set out to do."

Jane Dougherty, a former co-worker of Mrs. Sorrells, corroborated Sorrells' testimony that she and other employees were permitted to use the phone to generate sales. Dougherty and other co-workers said that they took their stock books home, although not as frequently as Mrs. Sorrells. She also testified to the importance of interstore stock transfers and the use of promotional materials at Garfinckel's sales counters.

Another former co-worker, Ani Boitel, stated that telephone contact with clients was a necessary and effective means of generating sales. Boitel testified that it would be reasonable to make $3,000 to $4,000 per month in sales on a small line such as Frances Denney's, but that restricting a salesperson's access to a phone or a stock book or her ability to make transfers of stock between stores would adversely affect her sales.[5]

Mrs. Williams' testimony varied in many respects from that of Mrs. Sorrells, creating issues of fact and credibility for the jury. Williams intimated that she had been partially responsible for initially obtaining a telephone for Sorrells' use. Contrary to other evidence that Mrs. Sorrells got along well with fellow employees, Williams testified that she had received complaints that Sorrells monopolized the phone, and she denied that she ever restricted Sorrells' use of the phone. Williams also said that she did not deprive Mrs. Sorrells of her stock book except during Sorrells' vacations and inventory periods, and that she restricted Sorrells from making stock transfers only once. Williams acknowledged giving Sorrells an overall performance rating of "fair, needs improvement." She did not recall removing any promotional items from Mrs. Sorrells' counter, stating that such a task would fall to one of her assistants. She admitted that she authorized her assistant to remove Mrs. Sorrells' stool, but she said she did not know of Mrs. Sorrells' medical need for the stool until after it was taken away. Williams also admitted that she recommended to Vandevort "several times" that he fire Mrs. Sorrells and that she rebuked Sorrells for complaining to Vandevort. She could not explain how Sorrells' failure to take a lunch hour might cause any problem at work.

## II

At issue in Mrs. Sorrells' appeal is whether the trial court erred in granting summary judgment for Garfinckel's on her wrongful discharge claim. Controlling precedent compels us to affirm that decision.

Because Mrs. Sorrells was an at-will employee, she "could be terminated at will by [her] employer for any reason or no reason at all." *Wemhoff v. Investors Management Corp.*, 528 A.2d 1205, 1208 n. 3 (D.C. 1987), citing *Taylor v. Greenway Restau-*

5. Mrs. Sorrells testified that Mrs. Williams told her on one occasion that she would have to sell $100,000 worth of merchandise to receive a raise, more than double what she sold in 1979, and more than double the amount which Boitel thought reasonable.

*rant, Inc.,* 173 A.2d 211 (D.C.1961); *accord, Pfeffer v. Ernst,* 82 A.2d 763, 764 (D.C.1951) (citing cases). It is "well-settled District of Columbia law" that an employment contract, absent evidence to the contrary, is terminable at the will of either party. *Minihan v. American Pharmaceutical Ass'n,* 259 U.S.App.D.C. 10, 11, 812 F.2d 726, 727 (1987) (citations omitted). We are bound by *Wemhoff, Taylor,* and *Pfeffer. See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). We also note that, just a few years ago, a majority of this court en banc declined to consider whether the at-will employment doctrine should be abrogated through adoption of the wrongful discharge tort pleaded by Sorrells. *See Ivy v. Army Times Publishing Co.,* 428 A.2d 831 (D.C.1981).[6]

Even if we were disposed to carve out an exception to the at-will employment doctrine, no "statutorily declared public policy" supports Sorrells' claim of wrongful discharge in this case. *See id.* at 833 (Ferren, J., dissenting). The only policies that Sorrells urges upon us are (1) that she should be able to sue her corporate employer because it has the deepest pockets and is "better able to pay the damages," (2) that there is a burden placed on society when a discharged employee is without income, and (3) that there is a potential for attorney conflicts of interest when, as in this case, the employer's attorney also represents a supervisory employee. These concerns plainly do not amount to a "statutorily declared public policy."

The one statute cited by Sorrells as a possible basis for her claim against Garfinckel's is the District of Columbia Human Rights Act, D.C.Code § 1–2511 *et seq.* (1987 & 1989 Supp.). But she does not rely on any specific provision of the Human Rights Act; rather, she asks this court to "broaden" the policies expressed in the Hu-

man Rights Act and to fill a perceived "gap" in the Act. This is an invitation to judicial activism, which we unequivocally decline. The Human Rights Act is a carefully crafted statute with very broad coverage. *See* D.C.Code § 1–2512(a) (1987) (prohibiting discrimination in employment based on any of thirteen specified grounds). The evidence in this case, however, whatever else it may prove, does not establish a violation of the Human Rights Act; *i.e.,* it does not show that Mrs. Sorrells was the victim of discrimination based on any of the thirteen grounds listed in section 1–2512(a). Insofar as Sorrells' concerns are unprotected by the Act, that is the result of the way the Act is written. We cannot rewrite it or extend its coverage beyond the limits set by the legislature.

### III

Williams contends in her cross-appeal that, as a matter of law, she cannot be liable to Mrs. Sorrells on an interference with contract claim because she was an agent of Mrs. Sorrells' employer and because she was Sorrells' supervisor. Williams contends that as an agent of Garfinckel's she was not a third party to the contractual relationship between Sorrells and Garfinckel's, so that she could not tortiously interfere with that relationship.

■■ To recover in tort for intentional interference with contractual relations, the plaintiff must prove four elements: "(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach." *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 288 (D.C.1977) (citation omitted). "Once a prima facie case has been established," it becomes the defendant's burden to prove "that his [or

---

**6.** Sorrells' reliance on *Newman v. Legal Services Corp.,* 628 F.Supp. 535 (D.D.C.1985), and *Wemhoff, supra,* is entirely misplaced. *Newman* concluded that this court, if given an opportunity, would recognize the tort of wrongful discharge, 628 F.Supp. at 538–539, but this conclusion is bereft of support, relying as it does exclusively on the dissent in *Ivy. See Hall v. Ford,* 272 U.S. App.D.C. 301, 313, 856 F.2d 255,

267 (1988) (noting that *Newman* was contrary to District of Columbia precedent). *Wemhoff* offers no support for Sorrells' position because *Wemhoff* did not recognize a "public policy exception" to the at-will employment doctrine, and because the only support for such an exception advanced in *Wemhoff* is the dissent in *Ivy. See Wemhoff, supra,* 528 A.2d at 1208 & n. 3.

her] conduct was legally justified or privileged." *Id.*, citing *Deoudes v. G.B. Macke Corp.*, 153 A.2d 309, 310 (D.C.1959), and *Meyer v. Washington Times Co.*, 64 App. D.C. 218, 76 F.2d 988, *cert denied*, 295 U.S. 734, 55 S.Ct. 646, 79 L.Ed. 1682 (1935). In other words, a trier of fact may find for the plaintiff who presents a *prima facie* case unless the defendant proves that his or her conduct was justified or privileged. *See also* RESTATEMENT (SECOND) OF TORTS §§ 766–767 (1979).

Section 766 of the Restatement tells us:

One who intentionally *and improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. [Emphasis added.]

The Restatement's reference to "improper" conduct is simply another way of saying that the alleged tortfeasor's conduct must be legally justified. A comment to this section makes clear that claims of justification are vitiated if malice is proved. RESTATEMENT § 766 comment s. Further, section 767 of the Restatement sets forth seven factors which should be considered in determining whether interference with a contract is "improper":

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

■ Williams contends that because she was Sorrells' supervisor and Garfinckel's agent, she cannot be considered a third party for the purposes of Sorrells' claim. She relies principally on *Press v. Howard University*, 540 A.2d 733 (D.C.1988), in which a former faculty member sued several university officials who, he alleged, interfered with his contract with the university and thereby caused him to be fired. This court held that "the individual defendants, all of whom were officers of the University, were acting as agents of the other party to the contract [the University], and that the University through their actions could not interfere with its own contract." *Id.* at 736 (citations omitted). *Press* is distinguishable from this case. In *Press* the individual defendants were officers of the university, not just supervisory employees; more importantly, there was no allegation that they had acted maliciously. As officers acting within the scope of their official duties, they served as the alter ego of the university and had the power to bind the university. In the instant case, however, Williams was not an officer of Garfinckel's. She did not have the power to fire Mrs. Sorrells; only an officer (Vandevort) could do that. " 'Employer,' in the context of a corporation, is 'a person who is realistically the alter ego of the corporation' and not 'merely a foreman, supervisor, or manager.' " *Rustin v. District of Columbia*, 491 A.2d 496, 501 (D.C.) (citation omitted), *cert. denied*, 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985). Because Williams was not a party to the contract between Garfinckel's and Mrs. Sorrells, she could be found liable for tortious interference with that contract. *See Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744, 754–755 (1981) (a person who is a party to the broken contract cannot be liable for contractual interference), cited with approval in *Press, supra*, 540 A.2d at 736. While it makes sense to shield from liability officers who act without malice, and within the scope of their authority, as in *Press*, the same cannot be said for a supervisor such as

Williams, who was not authorized to terminate the contract between Sorrells and Garfinckel's, and whom the jurors found to have acted with malice.

Rather, the law affords to a supervisor such as Williams a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers—those who have the power to hire and fire. We hold, as the jury was instructed, that this privilege is vitiated when the supervisor acts with malice for the purpose of causing another employee's contract to be terminated. Several courts apply the law of intentional interference with contract this way, and we think this is the better rule. *See, e.g., Kassman v. American University,* 178 U.S.App.D.C. 263, 266, 546 F.2d 1029, 1032 (D.C.1976) (holding that when a defendant acts "within the ambit of [his or her] employment but with malice," any privilege is vitiated); *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 386–389, 710 P.2d 1025, 1041–1044 (1985) (improper interference with contractual relations by a supervisor supports an action for tortious interference with contract); *Trimble v. City & County of Denver,* 697 P.2d 716, 726 (Colo. 1985) ("even an agent can be liable for improper interference with the principal's contractual relations.... If the actor is motivated solely by a desire to harm one of the contracting parties or to interfere in the contractual relations between those parties, the interference is certainly improper." (citations omitted)). The rule has been applied even to corporate officers and directors. *See Phillips v. Montana Education Ass'n,* 187 Mont. 419, 425, 610 P.2d 154, 158 (1980) ("Where an officer or director acts ... with the intent to harm the plaintiff, he is personally liable" (citations omitted)). It serves no purpose to immunize supervisory employees for their tortious conduct when they are neither parties to the contract between other employees and their common employer, nor empowered by the employer to act as its alter ego with authority to abrogate contractual relationships.

Professor Prosser, in a section cited in *Press,* states the general rule that "the defendant's employees acting within the scope of their employment are identified with the defendant himself so that they may *ordinarily* advise the defendant to breach his own contract without themselves incurring liability in tort." W. KEETON, PROSSER & KEETON ON THE LAW OF TORTS § 129, at 990 (5th ed. 1984) (emphasis added). In a footnote, however, Prosser points out—and we hold here—that "[t]he rule does not protect one who procures a discharge of the plaintiff for an improper or illegal purpose." *Id.* at 990 n. 25 (citations omitted). Applied to this case, this principle means that a person who maliciously procures the discharge of another by their common employer is not shielded from liability by his or her status as a supervisory employee.

IV

Perhaps anticipating our holding that a supervisory employee has the right to interfere with a subordinate employee's contract of employment only for proper purposes, and that this right is vitiated if the supervisor acts with malice, Williams contends that the court should have granted her motion for a directed verdict because there was insufficient evidence that she acted maliciously to permit the case to go to the jury. We do not agree. In reviewing the trial court's ruling, either on a motion for directed verdict or on a motion for judgment notwithstanding the verdict, we must consider the evidence in the light most favorable to the non-moving party—in this instance, the plaintiff Sorrells. A trial court may take from a jury only those issues on which the evidence permits but one conclusion, so that no reasonable juror could find for the non-moving party. *E.g., Crooks v. Williams,* 508 A.2d 912, 914 (D.C.1986); *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103–1104 (D.C.1986); *District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C.1982) (en banc); *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.1982). In the case at bar, while the evidence that Williams acted

with malice was not overwhelming, we hold that it was sufficient to go to the jury.

"Proof of fraud or malice 'need not be by direct evidence but may appear from all the facts and circumstances of the case.'" *Bay General Industries, Inc. v. Johnson,* 418 A.2d 1050, 1058 (D.C.1980) (citations omitted). "In the context of a qualified privilege, the definitions of malice 'in substance come down to the equivalent of bad faith.'" *Ingber v. Ross,* 479 A.2d 1256, 1264 n. 9 (D.C.1984) (citation omitted). Further, while the issue of whether a privilege exists is generally a question of law, "whether it was abused by the defendant is a question of fact for the jury." *Mosrie v. Trussell,* 467 A.2d 475, 477 (D.C.1983) (citations omitted).

Following these principles, and considering the evidence in the light most favorable to Mrs. Sorrells, we hold that it was sufficient to go to the jury on the question of malice.[7] Sorrells and others testified that she was dependent on telephone sales to do her job effectively, that this fact was made clear to the management of Garfinckel's, but that Williams inexplicably took her telephone away and denied doing so to the personnel manager. Sorrells also testified, and others corroborated, that Williams ridiculed her and the products she sought to sell in front of customers. There was conflicting testimony, which the jury was entitled to resolve in Mrs. Sorrells' favor, that Williams restricted her—and no other employee—from taking the stock book home, from making stock transfers, and from us-

ing the telephone. The jury was also entitled to decide whether Williams ordered Sorrells' stool to be removed out of spite, with the intent to cause her physical pain, and whether Williams improperly ordered the removal of Sorrells' promotional materials from the counter. Williams never refuted Sorrells' testimony that Williams had prohibited her from taking further Saturdays off in retaliation for going over her head with complaints. It was also undisputed that Williams urged Mr. Vandevort several times to fire her. Most tellingly, Williams never denied saying, "I finally accomplished what I set out to do," nor did she explain this statement, which she made almost immediately after Sorrells was fired.

Because jurors cannot look into a defendant's mind, they must examine all the objective facts in trying to discern a pattern of acts which establish malice. That is a jury function. Resolving all credibility issues and inferences in Mrs. Sorrells' favor, we hold that the jury could find, on the basis of all the evidence, that Williams maliciously destroyed Sorrells' ability to generate sales and otherwise interfered with her performance, with the object of causing her to be fired by Mr. Vandevort.

As to both appeals, therefore, the judgment of the trial court is

*Affirmed.*

MACK, Associate Judge, concurring:

While I concur fully in this opinion, I want to go on record as favoring reconsid-

---

7. The jury was very carefully instructed on privilege and malice in this case. In relevant part, the court told the jury:

[I]n these circumstances, the defendant's conduct is qualifiedly privileged—that is, it is privileged subject to the condition which I shall now explain—and your verdict should be for the defendant unless you find, by a preponderance of the evidence, that she engaged in that conduct by reason of malice toward the plaintiff.

\* \* \* \* \* \*

Malice involves a state of mind of the defendant and is best described by personal ill will, spite, hostility, or a deliberate intent to harm the plaintiff. In this case, the presence or absence of malice is not a matter of whether the defendant was a competent supervisor, or even of whether she was an entirely fair one.

Rather, it comes down to whether she acted in bad faith. If the defendant acted with the belief, in good faith and on reasonable grounds, that her conduct was in furtherance of Garfinckel's business interests, then her conduct was not malicious, and your verdict should be for the defendant, even if the defendant knew that the termination of plaintiff's employment was a substantially certain consequence of defendant's conduct and the defendant desired to bring it about. On the other hand, if you find by a preponderance of the evidence that the defendant acted in bad faith in that she was motivated primarily by personal ill will, spite, hostility, or a deliberate intent to harm the plaintiff, and not to further any business interest of Garfinckel's, then the defendant's conduct was malicious.

eration, by the en banc court, of the doctrine that an at-will employee "could be terminated at will by his [or her] employer for any reason or no reason at all." *See Wemhoff v. Investors Management Corp.*, 528 A.2d 1205, 1208 n. 3 (D.C.1987), citing *Taylor v. Greenway Restaurant, Inc.*, 173 A.2d 211 (D.C.1961); *see also Ivy v. Army Times Publishing Co.*, 428 A.2d 831 (D.C. 1981) (en banc) (Ferren, J., dissenting).