CURAFLEX HEALTH SERVICES, INC., Plaintiff,

v.

Larry M. BRUNI, M.D., P.C., et al., Defendants.

No. 92–2866 PLF.

United States District Court, District of Columbia.

Sept. 15, 1995.

Allen V. Farber, Green, Stewart & Farber, P.C., Washington, DC, for plaintiff.

Steven M. Schneebaum, Patton, Boggs & Blow, Washington, DC, for defendants.

*OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW*

PAUL L. FRIEDMAN, District Judge.

This case was tried before the Court without a jury over three days to resolve the sole issue remaining in the case, plaintiff's claim for tortious interference with contract. Upon consideration of the evidence presented at trial and the parties' pretrial briefs, and for the following reasons, the Court finds in favor of the defendants.

## I. BACKGROUND

### A. The Parties

Curaflex Health Services, Inc. ("Curaflex") was a business that provided home infusion products and services to patients infected with the HIV virus.[1] Defendant Larry M. Bruni, M.D., P.C. ("Bruni P.C.") was a medical practice located in Washington, D.C., that primarily served such patients. Defendant Larry M. Bruni, M.D. ("Dr. Bruni") was the president, sole shareholder and principal physician of Bruni P.C. He is also a director and shareholder in Medical Office Management Systems, Inc. ("MOMS"). MOMS is a D.C. corporation that develops and supplies a medical software package called MEDSYS. Defendant Gary P. Whaley is both MOMS' president and one of its shareholders. He also was the corporate secretary and business manager of Bruni P.C. Defendant Whaley was responsible for all the bookkeeping and financial administration of both MOMS and Bruni P.C. Michael Anestos was Bruni P.C.'s outside general counsel.

### B. Procedural History

On December 23, 1992, Curaflex brought suit against Dr. Bruni, Bruni P.C., MOMS and Mr. Anestos. Curaflex subsequently amended its complaint to add a count and a fifth party, Mr. Whaley. Counts I, II and III of the amended complaint alleged conversion; Count IV alleged breach of contract with respect to the Product and Service Supply Agreement ("PSSA") between Curaflex and Bruni P.C.; Count V alleged tortious interference with the PSSA; Count VI alleged breach of contract on a promissory note (against Bruni P.C. only); Count VII alleged breach of contract on the guaranty of the promissory note (against Dr. Bruni only); Count VIII alleged conspiracy to convert; Count IX alleged aiding and abetting conversion; and Count X alleged tortious interference with prospective economic and business relations.

On January 21, 1993, defendants filed their answer and five counterclaims against Curaflex. In Counterclaims I and II, Bruni P.C. alleged breach of contract; in Counterclaim III, Bruni P.C. alleged conversion; in Counterclaim IV, MOMS alleged breach of contract; and in Counterclaim V, Dr. Bruni and Bruni P.C. alleged slander.

On May 18, 1994, Bruni P.C. filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. On October 19, 1994, Bankruptcy Judge Martin Teel granted Bruni P.C.'s motion to convert the Chapter 11 proceeding into one under Chapter 7. Plaintiff has filed a proof of claim in the Bankruptcy Court for all sums due under the PSSA.

On November 18, 1994, the Court granted defendant Michael Anestos' Motion for Summary Judgment and dismissed him from the case. On the same day, the Court granted Plaintiff's Motion for Partial Summary Judgment on Count VI of the Amended Complaint (breach of contract on the promissory note) and entered judgment against the now bankrupt Bruni P.C., the only defendant named in that count. On February 27, 1995, the Court entered judgment in the defendants' favor on Counts I, II, III, VII, VIII, IX and X of the Amended Complaint.

Pursuant to a Consent Order dated July 10, 1995, the parties consented to a judgment in favor of plaintiff and against Bruni P.C. on Count IV of the Amended Complaint (breach of contract), with damages in the amount of $850,000. The parties also consented to a judgment in favor of defendant Bruni P.C. on the Second Counterclaim, with nominal damages in the amount of $1.00. Finally, the

---

1. In 1994 Curaflex merged with Coram Healthcare Corporation and is currently doing business as Coram Health Services, Inc.

parties consented to a judgment in favor of defendant MOMS on the Fourth Counterclaim, with damages in the amount of $20,-442.80. Counterclaims I, III and V were abandoned by defendants.

The remaining claim in this lawsuit, which was tried before the Court on July 12–14, 1995, is Count V of Plaintiff's Amended Complaint. The crux of plaintiff's claim is that defendants Dr. Larry Bruni, Mr. Gary Whaley and MOMS tortiously interfered with Bruni P.C.'s performance of its contractual obligations under the PSSA and that, as a proximate result of their interference, Bruni P.C. breached its contract with Curaflex.

### C. Stipulated Facts

The parties stipulated to the following facts in their Joint Pretrial Statement of June 28, 1995, or agreed to them in their Consent Order of July 10, 1995.

On May 11, 1992, Curaflex entered into a Product and Service Supply Agreement ("PSSA") with Bruni P.C. Joint Ex. No. 1. Pursuant to the terms of the PSSA, Curaflex would provide certain home infusion products and services to Bruni P.C. and its patients. Joint Ex. No. 1, ¶ 2. Under the PSSA, Curaflex would also bill those patients and/or their insurers as Bruni P.C.'s billing agent. Joint Ex. No. 1, ¶ 2.9. The PSSA provided that Bruni P.C. would compensate Curaflex seventy percent (70%) of the total amount billed for Curaflex services, regardless of whether or not Bruni P.C. actually received payment for the services. Joint Ex. No. 1, ¶ 5.1.

From May 11, 1992, until the termination of the PSSA on March 17, 1993, Curaflex duly provided services to patients of Bruni P.C., which generated accounts receivable. Some patients and third-party payors paid funds in excess of $900,000 directly to Bruni P.C. Joint Pretrial Statement at 3. Other patients and third-party payors deposited funds in excess of $400,000 into a lock box at Riggs Bank, as required under the PSSA. Joint Pretrial Statement at 3. From May 11, 1992 until December 23, 1992, when this suit was filed, Bruni P.C. paid a total of $128,680 to Curaflex for services rendered pursuant to the PSSA. Joint Pretrial Statement at 3–4.

The PSSA provided that Bruni P.C. would periodically instruct Riggs Bank to sweep the lock box funds into a Curaflex bank account. Joint Ex. No. 1, ¶ 5.2. Curaflex would retain any fees due it and transfer the remainder, if any, to Bruni P.C. Joint Ex. No. 1, ¶ 5.2. The PSSA also provided that independent of the lock box arrangement, Bruni P.C. was obligated to make payments owed to Curaflex on the sums paid directly to Bruni P.C. by its patients and other third-party payors within ninety (90) days of the third party invoice date. Joint Ex. No. 1, ¶ 5.1.

By November 1992, Bruni P.C. had fallen behind in making what Curaflex considered to be full and timely payments. Despite Curaflex's demands that Bruni P.C. perform its obligations under the PSSA, Bruni P.C. stopped making payments to Curaflex in November 1992. Bruni P.C. admits that it intentionally breached the PSSA. The parties have stipulated that the resulting damages from Bruni P.C.'s breach of the PSSA are $850,000. Consent Order, June 10, 1995, ¶ 1.

## II. FINDINGS OF FACT

Plaintiff called Mr. Gary Whaley and Dr. Larry Bruni as hostile witnesses at trial. Having evaluated the totality of Gary Whaley's testimony, including his attitude and demeanor in the courtroom and the significant contradictions between his trial and earlier deposition testimony, the Court finds him to have been a reluctant and inherently incredible trial witness. A comparison of his trial testimony with his deposition statements patently demonstrates that his testimony at trial was fraught with inconsistencies, incredible failures of recollection and outright misstatements of fact. Consequently, the Court finds defendant Mr. Whaley to be an unreliable witness. To the extent that the Court's findings of fact rely on Mr. Whaley's testimony at all, they rely on his more credible deposition testimony, not on his trial testimony.

Upon a careful consideration of all the evidence introduced at trial, the Court makes the following findings of fact:

1. At all relevant times, defendants Dr. Larry Bruni and Mr. Gary Whaley had

knowledge of the PSSA and the terms of Bruni P.C.'s contractual obligations to Curaflex. Defendant Whaley managed all the finances for and kept the books of both Bruni P.C. and MOMS. He was thoroughly familiar with Bruni P.C.'s assets, liabilities and expenditures.

2. Gary Whaley ran the financial affairs of Bruni P.C. and was the person most familiar with its books and records. With regard to defendant Whaley's management of the finances of both Bruni P.C. and MOMS, he acted not only as a corporate officer, but also as Dr. Bruni's agent. After considering the testimony of both Mr. Whaley and Dr. Bruni, the Court finds that the two defendants shared joint authority over the management of Bruni P.C.'s finances. This finding is based upon the testimony of both Dr. Bruni and Mr. Whaley concerning the nature of their business and personal relationships.[2]

3. Defendants Whaley and Dr. Bruni were deeply committed to ensuring the viability of MOMS. MOMS was a medical software company that they helped found, and in which together they owned a majority of the stock. Joint Pretrial Statement at 2. Its only notable product, MEDSYS, was a computer program designed to compile and process data for HIV research and treatment. Defendants Dr. Bruni and Mr. Whaley were interested in the benefits that MEDSYS promised to provide to HIV patients. The defendants also believed that MOMS had the potential to become a multi-million dollar corporation.[3]

4. In the months prior to Bruni P.C.'s entering into the PSSA, MOMS was an infant corporation with no payroll, no employees and less than $10,000 in liquid assets.

Whaley Dep., May 3, 1993, at 310. At that time, MOMS had never sold its product to any customer, and it depended completely upon Bruni P.C. for its sustenance. The Court finds that Dr. Bruni and Mr. Whaley, through Bruni P.C., bankrolled MOMS during this period and beyond. Whaley Dep., May 3, 1993, at 575–76.

5. Prior to July 1992, Bruni P.C. provided MOMS with funds totalling over $100,000. Bruni P.C. also supplied MOMS with countless hours of Bruni P.C. labor for its day-today operations, and Bruni P.C. paid its employees for the work they did for MOMS.[4]

6. On July 14, 1992, MOMS concluded a software licensing agreement with Curaflex and received a payment of $175,000. Upon receipt of those funds, MOMS transferred $100,000 to Bruni P.C. Pl.'s Ex. No. 3. Upon careful consideration of the conflicting statements made by defendant Whaley, the Court finds that this $100,000 transfer of funds constituted a partial repayment of the monies that Bruni P.C. previously had advanced to MOMS. By the end of 1992 however, MOMS still owed over $30,000 to Bruni P.C. for the financial support it had received to date. Pl.'s Ex. Nos. 7(d), 10; Whaley Dep., May 3, 1993, at 568–75.

7. By November of 1992, defendants Whaley and Dr. Bruni were admittedly in breach of the PSSA. On December 16, 1992, Curaflex sent a notice of default on a promissory note to Bruni P.C. Pl.'s Ex. No. 2. One week later, on December 23, 1992, Curaflex filed the instant lawsuit for Bruni P.C.'s breach of the PSSA and the promissory note.

8. In response to Curaflex's legal actions against Bruni P.C., defendant Whaley became "irate" and came to harbor a "lot of ill

**2.** For over 20 years, Dr. Bruni and Mr. Whaley have lived together as a couple and shared common financial interests. They have always, and continue to, entrust each other with joint dominion over their personal and business financial affairs.

**3.** Defendants' commercial aspirations were not limited to the economic success of MEDSYS or MOMS. At trial, Mr. Anestos described Dr. Bruni's dream of creating a "one-stop-shopping for AIDS" stratagem center—a place where HIV patients could receive in-house medical care, laboratory work and pharmaceutical services—all in

one convenient and confidential place. To Dr. Bruni, the MEDSYS system represented the keystone of such a framework.

**4.** According to Mr. Whaley's testimony, approximately ten of Bruni P.C.'s 20 employees dedicated some or all of their time to MOMS. In all instances, they received their salaries from Bruni P.C., not from MOMS. Among the Bruni P.C. employees who performed services for MOMS were Dr. Bruni, Messrs. Whaley, Craig, Sledziona, Platzer and Lapin, as well as outside counsel, Michael Anestos. *See also* Bruni Dep., March 29, 1993, at 43.

will [and] disdain for Curaflex." Whaley Trial Testimony. The Court finds that at some discrete moment in time on or about December 23, 1992, defendants Whaley and Dr. Bruni made the conscious decision that Bruni P.C. would continue in breach of the PSSA. Whaley Dep., April 6, 1993, at 222–26. They did so in their capacities as Bruni P.C. corporate officers.

9. From that point onward, no PSSA monies were swept from the lock box to Curaflex, nor were any other remittances made to Curaflex. Whaley Dep., April 6, 1993, at 223. Despite plaintiff's requests that Bruni P.C. escrow incoming PSSA funds pending the resolution of their contractual dispute, Bruni P.C. made no effort to set aside monies attributable to the PSSA. Instead, the money was removed from the lock box account and used for Bruni P.C.'s general operating expenses. Whaley Dep., May 3, 1993, at 391–93.

10. Between November 1992 and March 17, 1993, the period during which Bruni P.C. was in breach of the PSSA, defendants Whaley and Dr. Bruni continued to use Bruni P.C. monies for pocket cash, to make mortgage payments on their house, and for the purchase of meals, liquor, automobiles, vacations and trips to medical conferences. Dr. Bruni also used Bruni P.C. funds to pay his personal expenses—student loans, customtailored clothing, psychologist's bills, life insurance and the purchase of MOMS stock. *See* Pl.'s Ex. No. 7(b).

11. Moreover, while it was in breach of the PSSA, Bruni P.C. continued to bankroll MOMS. Whaley Dep., May 3, 1993, at 575. During that period, Bruni P.C. transferred additional funds to MOMS in excess of $60,000. Bruni P.C. employees continued to donate countless man-hours of labor to MOMS, all at the expense of Bruni P.C. Bruni P.C. donated labor to MOMS to satisfy all of MOMS's personnel needs—product development, systems architecture, hardware maintenance and legal counsel. Bruni P.C. also funded MOMS' advertising endeavors, including promotional trips to medical conferences.

12. When Dr. Bruni and Mr. Whaley diverted Bruni P.C. resources to MOMS, they did so for the purpose of benefitting MOMS. The Court finds that defendants Dr. Bruni and Whaley acted primarily on behalf of MOMS, not on behalf of Bruni P.C. During the period when Bruni P.C. was in breach of the PSSA, from November 1992 through March 17, 1993, defendants Dr. Bruni and Mr. Whaley were more interested in the financial success and viability of MOMS than in that of Bruni P.C.[5]

13. Based upon the evidence presented at trial, the Court finds that plaintiff failed to meet its burden of proof in demonstrating that the defendants harbored malice or ill will toward Curaflex prior to the institution of this lawsuit on December 23, 1992. To the contrary, the trial testimony of Mr. John Craig, a Bruni P.C. employee, indicates that in weeks prior to the breakdown of the PSSA, Bruni P.C. and Curaflex were engaged in good faith business negotiations. Craig Trial Testimony.

14. From the moment the lawsuit was instituted on December 23, 1992 until the PSSA terminated on March 17, 1993, however, the Court finds that defendants Dr. Bruni and Mr. Whaley harbored malice toward Curaflex and a zealous desire to cause it economic harm. The Court finds particularly compelling the defendants' conduct during the Curaflex business reception at Sfuzzi Restaurant in April 1993. At that reception, and during the course of the entire weekend, defendant Dr. Bruni prepared and distributed to Curaflex's present and prospective clients over five hundred copies of Bruni P.C.'s counterclaim against Curaflex. Whaley Dep., May 3, 1993, at 502, 506–07, 512.

15. Finally, the Court finds that defendants Dr. Bruni and Mr. Whaley wished to cause Curaflex pecuniary loss in its business dealings with Bruni P.C., and to adversely

---

**5.** As things turned out, MOMS did survive Bruni P.C., which declared bankruptcy in May 1994. Dr. Bruni's medical practice did manage to continue, however, as he established a new professional corporation named Vanguard. Thus, neither MOMS nor Dr. Bruni seem to have been adversely affected by the convenient bankruptcy of Bruni P.C., the only defendant to have a contractual obligation to Curaflex.

affect Curaflex's ability to generate new business with other medical practices. Whaley Dep., May 3, 1993, at 517–19.

## III. CONCLUSIONS OF LAW

Plaintiff has already obtained a judgment against Bruni P.C., a bankrupt corporation, for breach of contract in the amount of $850,-000. Plaintiff's outstanding claim is that defendants Dr. Bruni, Gary Whaley and MOMS tortiously interfered with Bruni P.C.'s performance of its contractual obligations under the PSSA and that, as a proximate result of their interference, Bruni P.C. breached its contract with Curaflex. As to this remaining claim, the Court reaches the following conclusions of law.

In the District of Columbia, the law on intentional interference with contractual relations provides that:

> One who intentionally *and improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285, 290 (D.C.1989) (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 766 (1979)).

■ To recover in tort for intentional interference with contractual relations, a plaintiff must first establish the requisite elements of a prima facie case: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of its breach; and (4) damages resulting from the breach. *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d at 289 (citing *Alfred A. Altimont, Inc. v. Chatelain, Samperton, and Nolan,* 374 A.2d 284, 288 (D.C.1977)); *see also Nickens v. Labor Agen-*

cy of Metropolitan Washington, 600 A.2d 813, 819 (D.C.1991). The third element, intentional procurement of breach, is another way of saying "inducing or otherwise causing" the breach. *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d at 290.

Plaintiff has successfully presented a *prima facie* case for intentional interference with contractual relations as against defendants Dr. Bruni and Gary Whaley. First, the parties stipulated to the existence of the PSSA between Bruni P.C. and Curaflex and to the breach of the PSSA. Second, it has been established that both defendants Whaley and Dr. Bruni had knowledge of the PSSA and its terms. Third, it has been established that defendants Dr. Bruni and Mr. Whaley intentionally procured, induced or caused the breach of the PSSA. Finally, the parties have stipulated that damages did result from the breach of the PSSA in the amount of $850,000.[6]

■ With regard to defendant MOMS, however, the Court concludes that plaintiff has failed to prove a necessary element of its *prima facie* case—the intentional procurement of breach, which, as *Sorrells* indicates, is synonymous with causation. Although MOMS, by and through the agency of Dr. Bruni and Mr. Whaley, had knowledge of the PSSA and was the beneficiary of their decisions, the Court concludes that defendant MOMS did not procure, induce or cause Bruni P.C. to divert monies for MOMS' own use. It is Dr. Bruni and Mr. Whaley's actions that caused the diversion of funds and, thereby, the breach of contract. There is no "substantial and direct causal link" between any action by MOMS and Bruni P.C.'s breach of the PSSA. *Connors, Fiscina, Swartz & Zimmerly v. Rees,* 599 A.2d 47, 51 (D.C.1991) (quoting *Dalo v. Kivitz,* 596 A.2d 35, 41 (D.C.1991)).

---

6. In post-trial memoranda, the parties expressed differing views on the correct calculation of damages for the tort of intentional interference with contractual relations. Plaintiff contends that damages should equal the pecuniary loss of the benefits of the breached contract, presumably $850,000, plus punitive damages if appropriate. Defendant argues that the proper measure of damages should be a function of the injury flowing from each tortious act itself, here the breach of several separate obligations to pay on the due dates under the PSSA, an amount often less than full expectation damages. Since the Court finds no tortious conduct in the instant case however, it becomes unnecessary to address the issue of damages.

Nor is the fact that MOMS spent funds diverted to it from Bruni P.C. (that could have been used by Bruni P.C. to pay the sums due Curaflex under the PSSA) sufficient to persuade the Court that MOMS intentionally procured the breach of contract. Money is fungible, and the law affords corporations the freedom to decide how to allocate their financial resources. Although Curaflex had a contractual right to monies due it by Bruni P.C. under the PSSA, it had no corresponding property right in specific Bruni P.C. funds, no matter what their attributable source. *Cf. Republic of Haiti v. Crown Charters, Inc.*, 667 F.Supp. 839, 845 (S.D.Fla. 1987) (a mere obligation to pay money may not be enforced by an action for conversion); *see also* Benjamin L. Fine, *An Analysis of the Formation of Property Rights Underlying Tortious Interference with Contracts and Other Economic Relations* 50 U.Chi.L.Rev. 1116, 1120 (1983) (an obligor's performance is not the obligee's property until the obligor has performed). Thus, Bruni P.C. could use its funds to subsidize MOMS without subjecting MOMS to suit for tortious interference with contract.

Plaintiff's claim against MOMS amounts to little more than a revival of its conversion claim, a claim that was previously rejected by this Court for the reasons stated in its Opinion and Order of February 27, 1995. Because plaintiff has not met its burden of proving a causal nexus between Bruni P.C.'s diversion of funds to MOMS and the breach of the PSSA, plaintiff has failed to establish a *prima facie* case against defendant MOMS.

■ As for plaintiff's claims against Dr. Bruni and Mr. Whaley, once plaintiff has successfully presented a *prima facie* case against defendants Dr. Bruni and Whaley, as it has, the burden then shifts to the defendants to prove that their contractual interfer-

ence was not "improper." *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d at 290; *see also* Restatement (Second) of Torts §§ 766–767 (1979). As the Court said in *Sorrells*, "[t]he Restatement's reference to 'improper' conduct is simply another way of saying that [to avoid liability,] the alleged tortfeasor's conduct must be legally justified." *Id.* at 290.[7]

Defendants Dr. Bruni and Mr. Whaley argue that their conduct was not "improper" because it was legally justified or privileged. They argue that decisions to make certain payments on behalf of Bruni P.C. rather than others are within the scope of their corporate responsibilities and because they were effectively one and the same as Bruni P.C., they cannot be held liable for "interfering" with their own contract. In sum, they argue that so long as they were acting within the scope of their employment and for the benefit of Bruni P.C. they are immune from suit for inducing a breach of, or tortiously interfering with, what was in essence their own contract.

■ As a matter of law, "a[ ] [corporate] officer is privileged to induce the corporation to violate a contractual relation ... provided that the officer does not exceed the scope of his authority or knowingly commit acts that are adverse to the interest of the corporation." *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228, 231 (La.1989); *see Nickens v. Labor Agency of Metropolitan Washington*, 600 A.2d at 819–20. If a corporate officer's contractual interference *is* for an illegal or improper purpose, or outside the scope of the officer's authority, however, then the privilege is vitiated and the individual officer may be held personally liable. *Id.* at 819–20; *see also Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d at 291 (quoting W. Page Keeton, et al., Prosser

---

7. To aid in determining whether an alleged tortfeasor's contractual interference is improper or whether it is legally justified, the District of Columbia also looks to the Restatement of Torts. *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d at 290. Consideration is generally given to the following factors:
    (a) the nature of the actor's conduct;
    (b) the actor's motive;
    (c) the interests of the other with which the actor's conduct interferes;

    (d) the interests sought to be advanced by the actor;
    (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
    (f) the proximity or remoteness of the actor's conduct to the interference; and
    (g) the relations between the parties.
*Id.* (citing Restatement (Second) of Torts § 767 (1979)).

AND KEETON ON THE LAW OF TORTS § 129, at 990 n. 25 (5th ed. 1984)).

Plaintiff insists that a corporate officer will also "be personally liable if he acts ... for his own pecuniary benefit, or with the intent to harm the plaintiff." *Nickens v. Labor Agency of Metropolitan Washington,* 600 A.2d at 820. Other jurisdictions have used similar language, explaining that a corporate officer may be held individually liable for his contractual interference if he acts with malice. *See, e.g., Hickman v. Winston County Hosp. Bd.,* 508 So.2d 237, 239 (Ala.1987); *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1037 (5th Cir.1990). Arguing that Dr. Bruni and Mr. Whaley procured Bruni P.C.'s breach of the PSSA for their own pecuniary benefit and out of malice toward Curaflex, plaintiff maintains that the defendants should be held personally liable for their contractual interference.

■ It does not follow, however, that a corporate officer's qualified privilege is *always* vitiated when he acts for his own pecuniary benefit or out of malice. So long as a corporate officer is acting in the corporation's interests, and is acting within the scope of his authority, his personal motivation is irrelevant, even if his actions happen to benefit himself or if he acts with ill will towards another. *Nickens* subtly explains that "a corporate officer may be held liable for interfering with the contract of an employee of the corporation provided he is shown to have acted maliciously or for his own benefit, *rather than* for the benefit of the corporation." *Nickens,* 600 A.2d at 820 (emphasis added); *see also Marc Development, Inc. v. Wolin,* 845 F.Supp. 547, 554 (N.D.Ill.1993) ("[plaintiff] must allege that the agent's intentional

acts were not taken to further its principal's best interests,. *but* to further the agent's personal goals or to injure the other party to the contract") (emphasis added).[8]

The public policy reasons behind this approach are sound. So long as corporate officers act in pursuit of what they faithfully believe to be their corporation's best interests, they should not be deterred by the threat of personal liability. *Wampler v. Palmerton,* 250 Or. 65, 439 P.2d 601, 607 (1968). Indeed, the corporate form is used by business people expressly to avoid such personal liability, and piercing the corporate veil to impose personal liability ˙is rarely countenanced. *See 9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d at 232 ("[s]ince officers owe fiduciary obligations to the corporation and its shareholders and hold policy making positions, their fidelity and freedom of action aimed toward corporate benefit should not be curtailed by undue fear of personal liability"); *see* HARRY G. HENN, LAW OF CORPORATIONS 637–644 (3d ed. 1983).[9]

The question here, therefore, turns on whether the defendants' interference with the PSSA was motivated by personal animus that resulted in conduct adverse to the interests of Bruni P.C. The Court has found that defendants Whaley and Dr. Bruni used Bruni P.C. funds for their personal benefit and for the benefit of MOMS. This Court has also found that during a portion of the time when Bruni P.C. was in breach of the PSSA, from December 23, 1992 through March 17, 1993, the defendants harbored ill will toward Curaflex. Nevertheless, for plaintiff to succeed in holding defendants Dr. Bruni and Mr. Whaley personally liable, it would also have to demonstrate that Dr. Bruni's and Mr. Whaley's interference with the PSSA was adverse

---

8. Most of the cases recognizing the tort of intentional interference that are reported in this jurisdiction have arisen in the employee termination context. *See Cafeteria and Restaurant Workers Union v. McElroy,* 284 F.2d 173 (D.C.Cir.1960); *Nickens v. Labor Agency of Metropolitan Washington,* 600 A.2d 813; *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285; *Press v. Howard University,* 540 A.2d 733 (D.C. 1988). In such cases, when a supervisor or corporate officer fires an employee out of malice or ill will, it ordinarily constitutes conduct that is generally adverse to the interests of the corporation. Thus, both the language employed in ex-

plaining the elements of the tort and the policy reasons behind its application to the wrongful discharge context must be kept in mind in determining the tort's applicability to other situations.

9. Once incorporated, a professional corporation ("P.C.") "has all the attributes of any other business corporation, including limited liability for its principals." W. FLETCHER, FLETCHER ENCYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2523.1 (1989). Thus, Bruni P.C. should be treated as any other corporation for the purposes of this analysis.

to the corporate interests of Bruni P.C. or that they breached their fiduciary duty to the shareholders. *See* HARRY G. HENN, LAW OF CORPORATIONS 639–643 (3d ed. 1983).

Bruni P.C. was a small corporation with only one shareholder—defendant Dr. Larry M. Bruni. Mr. Whaley, his personal and business partner, was the corporate secretary and business manager of Bruni P.C., always acting as Dr. Bruni's agent. At trial, Dr. Bruni expressed his approval of the manner in which Mr. Whaley "managed" Bruni P.C.'s financial affairs. There was no conflict of interest between the defendants and Bruni P.C. *See Brunswick Corp. v. E.A. Doyle Mfg. Co.*, 770 F.Supp. 1351, 1366 (E.D.Wis. 1991) (suggesting that if a corporate officer is the only owner of a company, there can be no breach of fiduciary duty). There has been no showing that the corporate diversion done by these defendants was outside the scope of their corporate authority or was not in the best interest of Bruni P.C. As a consequence, defendants' conduct cannot be deemed legally improper. *Cf. Press v. Howard University*, 540 A.2d at 736 (a party cannot tortiously interfere with its own contract); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129 at 990 (5th ed. 1984).

Because the conduct of Dr. Bruni and Mr. Whaley was not improper as a matter of law, their interference with the PSSA must be deemed privileged. Absent a finding of an independently wrongful or illegal act by the defendants, the Court can provide no remedy for the plaintiff. To conclude otherwise would constitute an unwise extension of tort law to what is essentially a breach of contract action against a closely-held, now bankrupt corporation and would render the limited liability of a corporation meaningless.

For the aforementioned reasons, this Court enters judgment in favor of defendants Dr. Larry M. Bruni, Mr. Gary Whaley and MOMS on Count V of Plaintiff's Amended Complaint.

SO ORDERED.

### JUDGMENT

This case was tried before the Court without a jury on July 12–14, 1995 to resolve plaintiff's claim for tortious interference with contract. For the reasons stated in the accompanying Opinion, Findings of Fact and Conclusions of Law on the same day as this judgment, it is this 14th day of September hereby

ORDERED that judgment is entered for defendants Dr. Larry Bruni, Mr. Gary Whaley and MOMS on Count V of the Amended Complaint, plaintiff's claim for tortious interference with contract; and it is

FURTHER ORDERED that this case is dismissed from the docket of this Court.

SO ORDERED.